T.C. Memo. 1998-362

UNITED STATES TAX COURT


SUDHIR P. SRIVASTAVA AND ELIZABETH S. PASCUAL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26605-95.              Filed October 6, 1998.



Michael D. Cropper, for petitioners.

W. Mark Scott, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined deficiencies in, and
penalties on, the Federal income tax for 1991 and 1992[1] of Sudhir
P. Srivastava (petitioner) and Elizabeth S. Pascual (Pascual) as
follows:

|      |            | Accuracy-Related Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1991 | $1,188,920 | $237,784 |
| 1992 | 33,037 | 6,607 |

---

[1]  The deficiency for 1992 is for petitioners' short taxable
year that began on Jan. 1, 1992, and ended July 7, 1992.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

The issues for decision are: (1) Whether petitioners may exclude from their gross income contingent fees of $3,455,500 paid to their attorneys from the settlement proceeds of petitioner's personal injury suit. We hold they may not. (2) Whether under section 104(a)(2) petitioners may exclude from their gross income the entire amount of the settlement petitioner received in 1991. We hold a portion of the amount petitioner received in settlement is attributable to punitive damages and interest and is taxable income to petitioners in the year it was received. (3) Whether petitioners may deduct the attorney's fees under section 162(a). We hold they may not deduct the attorney's fees under section 162(a), but they may deduct the fees under section 212(1), to the extent set out below. (4) Whether petitioners are liable for an accuracy-related penalty pursuant to section 6662 for 1991 and 1992. We hold they are to the extent set out below.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are

incorporated into our findings by this reference. Petitioners were husband and wife during the taxable years at issue and filed 1991 and 1992 Forms 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return". At the time the petition in this case was filed, petitioners resided in Midland, Texas.

Petitioner and Pascual are medical doctors. In 1970, petitioner graduated from a medical school in India. He came to St. Louis in 1972 for a residency in general surgery and later went to Canada to complete a residency in general and cardiothoracic surgery. In 1981, petitioner returned to the United States to practice medicine in Texas. Petitioner is certified as having an adequate level of training and practice for the cardiac surgery specialty by the American Board of Specialties Surgery and by the American Board of Thoracic Surgery.

The Lawsuit

In 1984 and 1985, petitioner was practicing as a cardiovascular thoracic surgeon in San Antonio, Texas. On February 8, 1985, a San Antonio television station, KENS-TV, began broadcasting a series of investigative reports about petitioner and his practice entitled "A Second Opinion". KENS-TV is a wholly owned subsidiary of Harte-Hanks Television, Inc., which in turn is owned by Harte-Hanks Communications, Inc. (Harte-Hanks Television, Inc., and Harte-Hanks Communications,

Inc., are referred to hereinafter as Harte-Hanks). The reports claimed that petitioner performed unnecessary surgery and delivered poor quality medical care; the reports alleged acts that would be criminal under the laws of Texas. As a result of the broadcast reports, petitioner's reputation and medical practice were destroyed, his hospital privileges were revoked, his medical malpractice insurance was canceled, and he was subjected to multiple malpractice suits.

After the series aired, petitioner brought suit in the 224th Judicial District Court of Bexar County, Texas, based upon defamation due to libelous and false statements, invasion of privacy, infliction of emotional distress, tortious interference with contracts, libel per se, and loss of medical practice, patients, and potential patients.[2] Petitioner pled for actual damages in an amount in excess of $8,500,000 and punitive damages in an amount in excess of $2 million, with prejudgment interest on damages, and interest on the judgment at the legal rate from date of judgment.

The case was tried before a jury in San Antonio during March and April 1990 resulting in a verdict on April 10, 1990. The jury found that the broadcast series was defamatory and false, impeached the honesty, integrity, virtue, or professional

---

[2] The suit was styled Sudhir Srivastava, M.D. vs. Harte-Hanks Television, Inc. d/b/a KENS-TV and Harte-Hanks Communication, Inc..

reputation of petitioner, and exposed him to public hatred, ridicule, or financial injury; and that the television station acted with knowledge of the falsity or with reckless disregard for the truth or falsity of the subject matter of the broadcasts. The jury also found that the series constituted an intentional infliction of emotional distress and trauma on petitioner.

The jury awarded petitioner $11,500,000 in actual damages, composed of the following amounts: $1,750,000 for loss of past earnings from his medical practice, $5 million for loss of future earning capacity, $1 million for past mental anguish, including embarrassment and humiliation, $500,000 for future mental anguish, $1,500,000 for loss of past reputation, and $1,750,000 for future loss of reputation. In addition, the jury awarded punitive damages of $17,500,000, bringing the total award to $29 million, plus interest.

Petitioner moved for a posttrial amendment of his pleadings to allow for damages in excess of $10,500,000, the total amount he initially sought in his suit, and the court allowed petitioner to amend his pleadings to conform to the adduced proof and the jury's verdict. The district court then entered judgment (the judgment).

Of the $11,500,000 in actual damages, the court found that $4,250,000 represented actual damages that had occurred between the date of the broadcast and the date of the judgment. Prejudgment interest of $2,597,201 had accrued on this portion of

the award, which brought the total actual damages and prejudgment interest to $14,097,201 and the total actual and punitive damages and prejudgment interest to $31,597,201.  Postjudgment interest of 10 percent per annum as provided by Texas law was ordered to be paid on this total sum.

After the judgment was entered, Harte-Hanks moved for a new trial, but its motion was denied on June 15, 1990.  On August 3, 1990, Harte-Hanks appealed the case to the Court of Appeals for the Fourth Court of Appeals District, San Antonio.[3]  However, while the appeal was pending, the parties agreed to settle.

The Insurance Coverage

Harte-Hanks' insurance coverage, which insured it against loss attributable to petitioner's claims against it, was "tiered".  That is, no insurance company provided coverage for the full range of Harte-Hanks' potential liability; rather, insurance was provided by several companies, and each insurance company provided coverage for a defined level of liability.  The television station's insurance coverage was provided as follows:

| Insurance Company | Layer of Insurance Coverage |
| --- | --- |
| Lower Tier | |
| Continental Casualty Co. (Continental) | First $2 million |
| American Casualty Company[1] | Same as Continental |
| Mission Insurance Company (Mission) | $2 million to $7 million |
| Western Employer's Casualty (Western) | $7 million to $12 million |

_____

[3]  This case was styled Harte-Hanks Television, Inc. and Harte-Hanks Communications, Inc. (Appellants) vs. Sudhir Srivastava, M.D. (Appellee).

| | |
|---|---|
| Columbia Casualty Company (Columbia) | $12 million to $22 million |
| Hudson Insurance Company (Hudson) | Co-insurer with Columbia |

### Upper Tier

| | |
|---|---|
| Federal Insurance Company (Federal) | Above $22 million |

[1] Continental and American Casualty hereinafter are collectively referred to as Continental.

After the judgment had been communicated to the insurance companies, and while the appeal of the judgment was pending, petitioner learned that Mission had been declared insolvent, and Western was functionally insolvent.  The insolvency of these two companies created an uninsured gap in Harte-Hanks' coverage between the $2 million and $12 million levels, which Harte-Hanks had to cover to activate coverage at the upper levels.

### The Settlement Agreement

On January 17, 1991, after prevailing at the trial level but before he was aware that the two insurance companies were insolvent, petitioner attempted to settle the entire case with Harte-Hanks for $21 million; $9,500,000 to settle the actual damages and $11,500,000 to settle the punitive damages.  Although this offer was rejected, the parties continued to negotiate.

On February 25, 1991, after he became aware of the insurance companies' insolvency, petitioner authorized his attorneys to settle with the  lower tier insurance companies (the first $22 million of coverage) for $8,500,000, and to make a demand for settlement upon the  upper tier insurance company (Federal) for

$2 million. On March 14, 1991, upon authorization of petitioner, a partial settlement agreement (the agreement) was entered into by petitioner, petitioner's attorneys, and Harte-Hanks.

The agreement provided for a payment to petitioner of $8,500,000 from Harte-Hanks and its insurers. Of that amount, Continental agreed to pay $2,100,000, and Harte-Hanks agreed to pay $1 million to settle the first $7 million in principal liability of the judgment. Harte-Hanks agreed to pay $2,400,000 to settle the principal amount of the judgment between $7 million and $12 million, and to the extent necessary, to settle all postjudgment interest liability on the first $22 million of the judgment. Columbia and Hudson agreed to pay $3 million to settle the principal amount of the judgment between $12 million and $22 million.

In reaching agreement, none of the payors considered whether the amounts they were paying were for actual or punitive damages. Nor did the payors or petitioner discuss any allocation of the settlement amount between actual or punitive damages. Instead, the parties regarded the judgment as a claim that totaled in excess of $31 million, considered the tiered structure of the insurance coverage, and tried to work out a settlement that preserved petitioner's claim against the upper tier insurer and resolved his claim against the lower tier insurers.[4]

_____

[4] Federal did not participate in the settlement negotiations, nor did it join in the appeal of the trial court's judgment. After the agreement was entered into, Federal filed a

(continued...)

The Contingency Fee

Although petitioner was represented at trial by the law firm of Branton & Hall, petitioner was initially represented in his suit by "Racehorse" Haynes and his law firm (the Haynes Firm). Petitioner's payment agreement with the Haynes firm was a straight fee arrangement. However, due to difficulties associated with the dissolution of the Haynes firm, petitioner's case languished. By the time petitioner hired Branton & Hall on May 30, 1989, he could not afford to pay the attorneys by the hour; therefore, he agreed to a contingency fee arrangement.

The payment arrangement was characterized by Jim Branton (Branton) as a "standard contingent fee arrangement". In addition to providing that all expenses necessary to prepare the case for settlement or trial, as well as expenses for trying the case, were to be paid by the client, the fee contract provided in relevant part that

> the undersigned, hereinafter called CLIENTS, employ the
> law firm of BRANTON & HALL, P.C., hereinafter called
> ATTORNEYS, understanding that the legal services
> rendered and to be rendered will be by ATTORNEYS of the
> professional corporation at its discretion. CLIENTS
> hereby sell, convey, and assign to BRANTON & HALL,
> P.C., as consideration for said services a forty
> percent (40%) interest in and to any and all causes of
> action, claims, demands, judgment or recoveries which

---

[4](...continued)
motion seeking a declaratory judgment that it had no liability for insurance coverage for any loss or damages arising out of the judgment obtained against Harte-Hanks by petitioner.

Federal's motion was granted, and a judgment was entered on Apr. 24, 1992, and subsequently affirmed by the Court of Appeals for the Fifth Circuit. Federal Ins. Co. v. Srivastava, 2 F.3d 98 (5th Cir. 1993).

CLIENTS may hold or receive because of damages and injuries received and sustained by DR. SUDHIR SRIVASTAVA and DR. ELIZABETH PASCUAL as a result of the television broadcasts on Channel 5 in February 1985.

\* \* \* \* \* \* \*

It is further agreed that this Contract does not include the appeal of any Judgment, and in the event of an appeal from any Judgment, CLIENTS shall advance the anticipated costs of appeal and the percentage contingent fee interest shall be increased from forty percent (40%) to fifty percent (50%).

Later, while the settlement negotiations were in progress, Branton & Hall hired Franklin S. Spears (Spears) in an of-counsel capacity to aid the firm with the appeal of petitioner's suit. Spears was also paid on a contingency fee basis. Spears' contract with Branton & Hall provided that he would be paid a contingency fee of $1,200,000 for the preparation of petitioner's briefs upon recovery of the total amount of the judgment, and a proportionally lesser amount if less than the total amount of the judgment was obtained. In the event of a partial settlement before the preparation and submission of petitioner's briefs, Spears would collect an amount determined on a sliding scale for each $1 million received in settlement.

When the case settled, Spears was paid $92,500 "off the top"; that is, the fee due Spears was deducted from the settlement proceeds before calculating the amount due Branton & Hall. Branton & Hall was paid $3,363,000; 40 percent of the settlement proceeds reduced by the $92,500 paid to Spears. Petitioner received the balance of the proceeds, $5,044,500, from

which petitioner paid Branton & Hall $44,730 for legal expenses.

Petitioners did not include any portion of the settlement proceeds in their income.  In the notice of deficiency, respondent determined that the amounts paid to the attorneys did not reduce the amount of the settlement proceeds includable in petitioners' gross income; however, respondent allowed the attorney's fees as a Schedule A miscellaneous itemized deduction.

OPINION

Issue 1.  Whether Petitioners May Exclude From Their Gross Income Contingent Fees Paid to Their Attorneys

Respondent determined that petitioners received $8,500,000 in settlement of their claim, and that they may not exclude from their gross income the portion of the settlement proceeds paid to Branton & Hall.  Petitioners assert that they never realized the amount paid to Branton & Hall, because they assigned Branton & Hall a 40-percent-ownership interest in the cause of action. Furthermore, petitioners assert that this issue was settled by the Court of Appeals for the Fifth Circuit in Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), affg. in part and revg. in part 28 T.C. 947 (1957).  We disagree with petitioners that Cotnam controls the Court's decision herein.

This case is appealable to the Court of Appeals for the Fifth Circuit, and under the Golsen rule, we follow the law of the circuit in which a case is appealable.  Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  The Court of Appeals' decision in Cotnam v. Commissioner,

supra, is based upon an interpretation of Alabama State law. This case involves an interpretation of Texas State law. The Golsen rule is therefore not applicable. See Golsen v. Commissioner, supra at 757.

In the Cotnam case, the taxpayer had entered into a contingent fee arrangement with her attorneys, under which the taxpayer agreed to pay the attorneys 40 percent of any amount recovered on a claim that they litigated on her behalf. The taxpayer received a judgment on the claim, and a check in the amount of the judgment was made payable to both her and the attorneys. The attorneys retained their share of the proceeds, and remitted the balance to the taxpayer. The Commissioner treated the amount of the judgment as taxable income and allowed a deduction for the attorney's fees. In holding that the amount retained by the attorneys was not includable in the taxpayer's gross income, the Court of Appeals for the Fifth Circuit concluded that under applicable State (Alabama) law, the contingent fee operated to assign to the attorneys anequitablelien and interest as to 40 percent of the judgment.[5]

---

[5] As stated in the provision of the Alabama Code relied upon by the Court of Appeals for the Fifth Circuit:

2. Upon suits, judgments, and decrees for money, * * * [attorneys] shall have a lien superior to all liens but tax liens, and no person shall be at liberty to satisfy said suit, judgment or decree, until the lien or claim of the attorney for his fees is fully satisfied; and attorneys at law shall have the same

(continued...)

*Cotnam v. Commissioner*, *supra* at 125.

The State of Texas, unlike the State of Alabama, does not regulate attorney's liens by statute. Instead, Texas relies upon common law for authority on this issue. *Thomson v. Findlater Hardware Co.*, 156 S.W. 301, 303 (Tex. Civ. App. 1913).

In Texas, an attorney's lien is paramount to the rights of the parties in the suit and is superior to other liens on the money or property involved. *In re Willis*, 143 Bankr. 428, 432 (Bankr. E.D. Tex. 1992). However, a lien is neither property nor a debt, but a right to have satisfaction out of property to secure the payment of the debt. *Crutcher v. Continental Natl. Bank*, 884 S.W.2d 884, 888 (Tex. App. 1994); *Texas Bank & Trust Co. v. Custom Leasing, Inc.*, 402 S.W.2d 926, 930 (Tex. Civ. App. 1966); *Windham v. Citizens Natl. Bank*, 105 S.W.2d 348, 350 (Tex. Civ. App. 1937). In Texas, an attorney at law has not been given a general lien on a cause of action or a judgment or money until it was collected and in his hands. *Finkelstein v. Roberts*, 220 S.W. 401, 405 (Tex. Civ. App. 1920). Furthermore, while an attorney has a lien on money collected by him for his client, he has no such lien for the debt in the hands of the debtor before

---

[5](...continued)
right and power over said suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them. [*Cotnam v. Commissioner*, 263 F.2d 119, 125 n.5 (5th Cir. 1959) (quoting 46 Ala. Code sec. 64 (1940) (quotation marks omitted)), affg. in part and revg. in part 28 T.C. 947 (1957).]

the money has been collected. <u>Thomson v. Findlater Hardware Co.</u>, <u>supra</u> at 303. Nor does a lien create an ownership interest in the attorney. <u>P&T Manufacturing Co. v. Exchange Sav. & Loan Association</u>, 633 S.W.2d 332 (Tex. App. 1982) (holders of valid mechanic's lien who had not foreclosed could not sue for conversion as they were not owners and did not have legal right to possession).

We do not find under the common law of Texas that because petitioner's attorneys were entitled to secure their earned contingent fee with a lien on the proceeds, the lien was a conveyance of an ownership interest in the settlement proceeds.

We turn next to petitioners' assertion that they never realized the amount paid petitioner's attorneys as they transferred to Branton & Hall a 40-percent ownership interest in petitioner's cause of action. Petitioners submit the contingency fee agreement as evidence of the transfer.

The question before us is to what extent, if any, petitioner could transfer to his attorneys an interest in his cause of action. We must look to the law of Texas for the answer to the question thus posed. Our determination in this regard should, according to the mandate of the Supreme Court of the United States in <u>Commissioner v. Estate of Bosch</u>, 387 U.S. 456 (1967), be predicated on State law, and the State's highest court is the best authority on its own law.

In <u>Dow Chem. Co. v. Benton</u>, 357 S.W.2d 565 (Tex. 1962), the

Supreme Court of Texas decided the issue of whether an attorney may prosecute a cause of action on his own behalf to secure a contingent fee after his client has been properly dismissed from the case. The attorneys argued that the contingent fee contract created in them "an immediate, vested, unrestricted, separate and distinct interest in the plaintiff's cause of action."[6] In holding the attorneys may not litigate a case after their client has been dismissed, the Supreme Court of Texas found that attorneys operating under a contingent fee contract do not have rights in a cause of action equal to those of their clients. Id. at 567.

The court first noted the fact that as the case involved the attorney-client relationship, it could not regard the case as one involving an ordinary assignment, devoid of public policy considerations. The court stated that the basic fallacy of the attorney's position was that it ignored the fact that the lawyer's rights, based on the contingent fee contract, are wholly derivative from those of his client. In Texas, the attorney-client relationship is one of principal and agent. Id.

---

[6] The contingent fee contract, which the Texas Supreme Court characterized as "the usual one", provided that the plaintiff agreed to "sell, transfer, assign and convey to my said attorneys the respective undivided interests in and to my said claim * * * and to any judgment or judgments that I may obtain". Dow Chem. Co. v. Benton, 357 S.W.2d 565, 566 (Tex. 1962). The contract further provided that if the case settled before filing of suit, the attorneys were to receive one-third of whatever was recovered for the plaintiff, and they would receive greater percentages if the suit was filed or appealed after trial. Id.

Furthermore, the court stated that

> there is but one cause of action. <u>Our decisions</u> <u>uphold</u> <u>an agreement to assign a part of the recovery</u> on the cause of action to the attorney. But we have never held that the cause of action is divisible and may be tried for only a percentage of the cause of action. [<u>Id.</u>; emphasis added.]

An attorney with a contingent fee contract is not so directly interested in the subject matter of a lawsuit as to make him a party; thus, Texas attorneys operating under a contingent fee contract do not have the same rights as their clients in the cause of action.[7]

We conclude, therefore, that under the facts and circumstances of this case, Branton & Hall and Spears had no ownership interest in petitioner's claim before settlement. Consequently, in analyzing this issue, we consider petitioner's contingent fee agreement an agreement to assign a part of the recovery on the cause of action to his attorneys.[8]

State law determines what property rights and interests a taxpayer has, but Federal law determines the consequences of such rights and interests for tax purposes. <u>Lyeth v. Hoey</u>, 305 U.S.

---

[7] The court clarified that its holding does not necessarily apply to the case where a plaintiff has assigned a portion of his cause of action to an independent third party.

[8] See <u>Brenan v. LaMotte</u>, 441 S.W.2d 626, 629 (Tex. Civ. App. 1969) (contract of employment which stated "we do hereby sell, transfer, * * * assign and convey unto * * *, our attorney, an undivided interest" in whatever plaintiffs may realize out of decedent's estate, held executory contract for contingent fee; contract did not convey interest in estate).

188 (1938). An attorney's right to compensation pursuant to a contingency fee agreement is a property right determined under applicable State law. Barnhill v. Johnson, 503 U.S. 393 (1992); Marre v. United States, 117 F.3d 297, 307 (5th Cir. 1997); Augustson v. Linea Aerea Nacional-Chile S.A., 76 F.3d 658, 662 (5th Cir. 1996). Under Texas State law, a contingency fee agreement is generally considered to be an executory contract. In re Willis, supra at 431; Brenan v. LaMotte, 441 S.W.2d 626, 630 (Tex. Civ. App. 1969); White v. Brookline Trust Co., 371 S.W.2d 597, 600 (Tex. Civ. App. 1963). Therefore, as a general rule, an attorney does not receive a legal or equitable interest pursuant to a contingency fee contract until the contingency actually occurs. In re Willis, 143 Bankr. at 431.

Although it is unclear what constitutes the defining moment at which the contingency occurs, at minimum, the contingency cannot occur before judgment is affirmed on appeal or when the time for filing an appeal has lapsed. Marre v. United States, supra at 308 (comparing Lee v. Cherry, 812 S.W.2d 361, 363 (Tex. App. 1991) (explaining that an executory contract is one that is still unperformed by both parties or one with respect to which something still remains to be done on both sides); White v. Brookline Trust Co., supra (contingency occurs after prosecuting or defending to final judgment all suits); Carroll v. Hunt, 168 S.W.2d 238, 240, 242 (Tex. Commn. App. 1943) (contingency occurs after successful termination of the litigation)). Once the

contingency occurs, the attorney has a lien on the judgment or settlement securing his services.  In re Willis, supra at 432.

Accordingly, until the contingent fee agreement between petitioner and Branton & Hall ripened through finalization of the lawsuit, it was executory.  Once the contingency occurred, the attorneys were entitled to a lien on the funds, which ultimately was satisfied when they received payment according to the terms of the agreement.

The Supreme Court has held that

> The rule that income is not taxable until realized has never been taken to mean that the taxpayer, * * * , who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can escape taxation because he has not himself received payment of it from his obligor. * * * [Taxation] may occur when he has made such use or disposition of his power to receive or control the income as to procure in its place other satisfactions which are of economic worth.

> *        *        *        *        *        *        *

> [T]he import of the statute is that the fruit is not to be attributed to a different tree from that on which it grew.  [Helvering v. Horst, 311 U.S. 112, 116-120 (1940); citation omitted.]

It is for this reason that "[taxation cannot] be escaped by anticipatory arrangements and contracts however skillfully devised to prevent * * * [the settlement amount] when paid from vesting even for a second in the man who earned it."  Lucas v. Earl, 281 U.S. 111, 115 (1930).  It is clear that petitioner enjoyed the full benefit of the settlement amount by using it to pay his attorneys for their services.  It is equally clear that

as petitioner's attorneys could not be parties in the cause of action and did not otherwise have rights in the cause of action equal to those of petitioner, in the terms of Lucas v. Earl, supra, the attorneys did not own any portion of the tree from which the settlement proceeds were derived.

Accordingly, we find that petitioners realized benefit from the entire amount of the settlement proceeds, and they may not exclude from their gross income the portion of the settlement proceeds paid to Branton & Hall and Spears.

Issue 2.  Whether Under Section 104(a)(2) Petitioners May Exclude the Entire Settlement Amount From Their Gross Income

Respondent and petitioners agree that the amount received by petitioner for actual damages is excludable from petitioners' income under section 104(a)(2).

Respondent determined that the $8,500,000 settlement amount should be allocated proportionally to the judgment of $11,500,000 in actual damages, $17,500,000 in punitive damages, and prejudgment interest of $2,597,201.[9]

Petitioners assert that as $8,500,000 is exactly the amount that petitioner initially pled as actual damages, and as it is

---

[9]  We note that this method of allocation was approved in Robinson v. Commissioner, 70 F.3d 34, 38 (5th Cir. 1995), affg. in part, revg. in part and remanding 102 T.C. 116 (1994); see also Rozpad v. Commissioner, T.C. Memo. 1997-528 (the judgment, albeit not final, nonetheless furnishes an adequate guideline for allocation by the Commissioner to the extent that it is composed of both compensatory damages and prejudgment interest), affd. __ F.3d __ (1st Cir. Aug. 25, 1998).

less than the amount awarded by the jury for only actual damages, the entire settlement amount is excluded from their gross income under section 104(a)(2).  Respondent's determination is presumed correct, and petitioners bear the burden of proving that respondent's determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

We have often been asked to decide the proper allocation of proceeds of a settlement agreement in the context of section 104(a)(2).  It is well settled that express allocations in a settlement agreement will be respected to the extent that the settlement agreement is entered into by the parties at arm's length and in good faith.  Robinson v. Commissioner, 70 F.3d 34 (5th Cir. 1995), affg. in part, revg. in part and remanding 102 T.C. 116 (1994).  If a lawsuit is settled, but no express allocations are made in the settlement agreement, we must consider the pleadings, the jury awards, or any court orders or judgments.  Robinson v. Commissioner, 102 T.C. at 127.  In order to characterize income as taxable under section 61 or excluded from taxation under section 104(a)(2), we must ascertain "in lieu of what were damages awarded" or paid.  Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987).

In the instant case, the partial settlement agreement does not specify how the $8,500,000 settlement amount is allocated between actual and punitive damages, or between principal and interest.  Accordingly, we consider all the facts and

circumstances to ascertain in lieu of what the settlement amount of $8,500,000 was paid. Id.

We do not find that the evidence supports petitioners' assertion that none of the amount paid in settlement was paid in lieu of either punitive damages or interest. To the contrary, the partial settlement agreement shows that Harte-Hanks agreed to pay, and petitioner agreed to accept, $2,400,000 in satisfaction of the principal amount of the judgment between $7 million and $12 million, and to extinguish any and all postjudgment interest liability on the first $22 million of the judgment. Furthermore, Columbia and Hudson agreed to pay, and petitioner agreed to accept, $3 million in satisfaction of the principal amount of the judgment between $12 million and $22 million. Columbia's and Hudson's liability threshold was $12 million, and the judgment provided total actual damages of $11,500,000; Columbia and Hudson would not have paid $3 million unless they thought prejudgment interest and punitive damages would total at least $3,500,000.

Harte-Hanks' agreement to pay postjudgment interest and Columbia's and Hudson's actual payment of several millions of dollars speak with a voice heard more clearly than petitioners' assertions. We find that petitioners have not carried their burden of proving that respondent's determinations are erroneous.

On brief, respondent proposes an alternative method of allocation which he concedes may be "the most proper methodology to use to allocate the settlement payment." Under this

alternative method, it is presumed that actual damages would be paid before prejudgment interest, postjudgment interest, or punitive damages, and that prejudgment interest would be paid before punitive damages.

Under this methodology, the combined $3,100,000 payment made by Continental and Harte-Hanks, which was the amount agreed upon to settle Harte-Hanks' liability for the first $7 million of damages, is allocated to settle $7 million of the $11,500,000 of actual damages provided by the judgment. Accordingly, petitioners would exclude $3,100,000 under section 104(a)(2) as the settlement amount they received for $7 million worth of the actual damages.

Harte-Hanks paid $2,400,000, to settle the principal amount of the judgment between $7 million and $12 million, and to the extent necessary, to settle all postjudgment interest on the first $22 million of the judgment. This amount is allocated to actual damages of $4,500,000,[10] prejudgment interest of $500,000, and postjudgment interest of $1,826,301.[11] Accordingly, $1,582,116 of the $2,400,000 payment is allocated to actual

---

[10] This figure equals the $11,500,000 total actual damages minus the $7 million actual damages which were settled for $3,100,000.

[11] Respondent calculated postjudgment interest on the first $22 million of the judgment assuming a period of 303 days, from May 15, 1990 (the judgment date), to Mar. 14, 1991 (the date of the partial settlement agreement), a 365-day calendar year, and a rate of 10 percent per annum.

damages,[12] and the remaining $817,884 is allocated to prejudgment and postjudgment interest.

Finally, the $3 million paid by Columbia and Hudson to settle their liability for coverage between $12 million and $22 million is allocated entirely to prejudgment interest and punitive damages. At this level, all of the $11,500,000 in actual damages has been exhausted, in addition to $500,000 of prejudgment interest and all of the postjudgment interest. Furthermore, the settlement amount of $3 million for $10 million of liability ($22 million minus $12 million) reflects the diminished likelihood of petitioner's recovering damages and interest in an amount above $12 million if the case was appealed.

Extending respondent's alternative method of allocation, we find that of the $3 million paid by Columbia and Hudson, $629,160 was paid in lieu of prejudgment interest, and $2,370,840 was paid in lieu of punitive damages.[13]

_____

[12] This amount is calculated by multiplying the $2,400,000 paid by Harte-Hanks by $4,500,000 of remaining actual damages divided by the sum of the $4,500,000 (actual damages), $500,000 (prejudgment interest), and $1,826,301 (postjudgment interest).

[13] In the alternative allocation scheme, respondent assumed that the prejudgment interest would be paid before the punitive damages. The prejudgment interest totaled $2,597,201, of which $500,000 was already settled out of the $2,400,000 payment by Harte-Hanks. Columbia and Hudson would therefore pay the balance of the prejudgment interest, $2,097,201, before they paid any punitive damages.
The portion of Columbia's and Hudson's payment allocated to interest is calculated by dividing the balance of the prejudgment interest by Columbia's and Hudson's total liability, $10 million,
(continued...)

Accordingly, on the basis of all the facts and circumstances of this case, we find that $4,682,116 of the settlement proceeds was paid to petitioner in lieu of actual damages, which is excluded from gross income under section 104(a)(2), and $3,817,884 was paid in lieu of punitive damages and interest, which is included in gross income under section 61.

Issue 3.  Deductibility of Attorney's Fees Under Section 162

In the notice of deficiency, respondent allowed petitioners a deduction under sections 212(1) and 265 for legal fees allocable to the taxable portion of the settlement proceeds. Petitioners assert in their reply brief that if this Court finds that petitioners realized the amount paid to petitioner's attorneys, they are entitled to deduct that amount under section 162(a) as an ordinary and necessary expense incurred during the taxable year in carrying on a trade or business.

In analyzing the issue of whether the attorney's fees were an expense incurred for the production or collection of income under section 212(1) or as an ordinary and necessary expense under section 162(a), we consider the origin and character of the claim with respect to which the litigation expense was incurred. United States v. Gilmore, 372 U.S. 39 (1963).

---

[13](...continued)
and multiplying that amount by their $3 million payment.

Similarly, the amount allocated to punitive damages is calculated by dividing the balance of their liability, $10 million minus $2,097,201, by their total liability, $10 million, and multiplying that amount by their $3 million payment.

As there is no general Federal common law of torts, nor controlling definitions in the tax code, we must look to State law to analyze the nature of the claim litigated. <u>Burnet v. Harmel</u>, 287 U.S. 103, 110 (1932) (State law creates legal interests; Federal law determines when and how to tax).

Petitioner's personal injury suit was for libel, a defamation action. All defamatory statements (whether libel or slander) attack a person's good name.[14] See <u>MacFadden Publications, Inc. v. Wilson</u>, 121 S.W.2d 430 (Tex. Civ. App. 1938). Whether the defamatory attack is on the personal reputation or the professional reputation of the individual, the defamation is personal in nature. <u>Gulf At. Life Ins. Co. v. Hurlbut</u>, 696 S.W.2d 83, 96-97 (Tex. App. 1985) (the action of defamation is to protect the personal reputation of the injured party, whereas the action for injurious falsehood or business disparagement is to protect the economic interests of the injured party against pecuniary loss), revd. and remanded on other

---

[14] Texas law provides the following:

> A libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury. [Tex. Civ. Prac. & Rem. Code Ann. sec. 73.001 (West 1997).]

grounds 749 S.W.2d 762, 766 (Tex. 1987).  In Newspapers, Inc. v. Matthews, 339 S.W.2d 890, 893 (Tex. 1960), the Texas Supreme Court reaffirmed that a business is not the subject of libel and that the defamation, if any, is of the owner of the business and not the business itself, whether the owner be an individual, partnership, or corporation.

If as a result of defamatory statements attacking the individual's character, the individual suffers some impairment of his professional relationships--in this case, petitioner's relationship with his patients and hospitals--the injury is to the person, although it may have derivative consequences for the business.  Roemer v. Commissioner, 716 F.2d 693 (9th Cir. 1983) (a defamatory attack on one's character should not be confused with the damage that flows from that injury), revg. 79 T.C. 398 (1982); see also Threlkeld v. Commissioner, 87 T.C. 1294 (1986) (holding Roemer v. Commissioner, 79 T.C. 398 (1982), revd. 716 F.2d 693 (9th Cir. 1983), will no longer be followed by this Court and expressing agreement with the reasoning for its reversal by the Court of Appeals for the Ninth Circuit), affd. 848 F.2d 81 (6th Cir. 1988).

As the defamation of an individual is a personal injury under the law of Texas, the expenses of litigating petitioner's claim for personal injury are not deductible as ordinary and necessary expenses incurred in carrying on a trade or business.

Petitioner cites McKay v. Commissioner, 102 T.C. 465 (1994),

vacated and remanded without published opinion 84 F.3d 433 (5th Cir. 1996), as authority for deducting the costs of litigating a personal injury suit as a business expense. We disagree.

In McKay, the taxpayer was an employee who brought suit for wrongful termination, breach of employment contract, RICO, and punitive damages. The taxpayer was awarded damages for lost compensation, "future" damages, and punitive damages for wrongful, malicious, and oppressive acts by his employer. After trial, the parties settled, and the settlement agreement provided that sums were paid in extinguishment of the taxpayer's tort claim for wrongful discharge and extinguishment of his breach of contract claim. In the settlement agreement, the parties agreed that the amount attributable to the wrongful discharge claim represented compensatory damages excludable under section 104(a)(2), and the amount allocable to the breach of contract claim was includable in income under section 61.[15] Finding that the allocations were the result of an arm's-length negotiation between hostile adversaries, this Court accepted the express allocations in the settlement agreement. Id. at 487.

---

[15] The Court of Appeals for the Fifth Circuit vacated our decision in this case. Citing Commissioner v. Schleier, 515 U.S. 323 (1995), the Court of Appeals held that the damages attributable to the taxpayer's wrongful discharge claim were not excludable under sec. 104(a)(2), because they were not received on account of a personal injury. McKay v. Commissioner, 84 F.3d 433 (5th Cir. 1996), vacating and remanding without published opinion 102 T.C. 465 (1994).

We held that under section 265, the portion of the attorney's fees allocable to the settlement amount for wrongful discharge was not deductible, but the portion of the attorney's fees allocable to the taxable portion of the suit, the breach of contract action, was deductible under section 162.

The facts of McKay v. Commissioner, supra, are clearly distinguishable from the facts of this case. In McKay, the taxpayer had two causes of action--one arising from the law of torts, the other from the law of contracts. The taxpayer in McKay received separate settlement amounts for each claim. In this case, petitioner has brought suit for a claim in tort, personal injury. Furthermore, the damages petitioner received all flow from the personal injury suit. McKay v. Commissioner, supra, is therefore, inapposite.

We agree with respondent's determination that the portion of petitioner's legal expenses allocable to the punitive damages and the interest received on the award are deductible under section 212(1) as expenses paid for the production of income. This treatment is consistent with other cases in which the taxpayer received damages in a defamation action. See, e.g., Roemer v. Commissioner, supra at 700; Church v. Commissioner, 80 T.C. 1104, 1110-1111 (1983).

Section 265, however, disallows deductions for amounts that are allocable to tax-exempt income. Consequently, only the attorney's fees attributable to punitive damages and interest are

deductible.

In <u>Church v. Commissioner</u>, <u>supra</u>, we used the following formula to calculate the correct deduction:

```
Total attorney's fees          Nonexempt income      Deductible
  and legal expenses     X    ----------------- =   expenses
                                  Total award
```

We have held that a portion of the settlement proceeds is attributable to punitive damages and interest and is includable in petitioners' income.  Accordingly, we find that $1,572,173 of attorney's fees and legal expenses is deductible under section 212(1) as a miscellaneous itemized expense.

Issue 4.  Accuracy-Related Penalty Under Section 6662

Respondent determined that petitioners are liable for accuracy-related penalties for the substantial understatement of tax under section 6662(a) of $237,784 and $6,607 for 1991 and 1992, respectively.  See sec. 6662(b)(2).  Petitioners assert that they are not liable for the penalty, because there was substantial authority for their reporting position, and they relied upon the advice of their professional tax adviser.

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in subsection (b).  Section 6662(b)(2) provides that section 6662 shall apply to any portion of the underpayment attributable to any substantial understatement of income tax.

There is a substantial understatement of income tax if the

amount of the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000. Sec. 6662(d)(1)(A). For purposes of section 6662(d)(1), "understatement" is defined as the excess of tax required to be shown on the return over the amount of tax that is shown on the return reduced by any rebate. Sec. 6662(d)(2)(A).

After adjustments,[16] respondent determined that the amounts of tax required to be shown on the returns are $1,194,296 and $45,969, and the amounts of the understatements of tax are $1,188,920 and $33,037 for 1991 and 1992, respectively. As each of these understatement amounts exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 for the year at issue, respondent applied the penalty.

Section 6662(d)(2)(B)(i) provides that the amount of the understatement shall be reduced by the portion of the understatement that is attributable to the tax treatment of any item if there is or was substantial authority for such treatment. The substantial authority standard is an objective standard

---

[16] Respondent determined that computational adjustments should be made for 1991 which would preclude petitioners from claiming deductions for personal exemptions, eliminated their deductions for medical expenses, adjusted the amounts of self-employment tax and the deduction for self-employment tax, and increased the allowance for charitable contributions.
Respondent determined that computational adjustments should be made for 1992 which would adjust petitioners' deduction for charitable contributions to conform with the percentage limitations.

involving an analysis of the law and application of the law to relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. There is substantial authority for the tax treatment of an item if at the time the return containing the item is filed or on the last day of the taxable year to which the return relates, the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment.[17] Sec. 1.6662-4(d)(3)(i), (iv)(C), Income Tax Regs.

It is the taxpayer's responsibility to establish he is not liable for the accuracy-related penalty imposed by section 6662(a). Rule 142(a); <u>Tweeddale v. Commissioner</u>, 92 T.C. 501, 505 (1989). Petitioners did not report any of the settlement proceeds they received in 1991. We have found that a portion of the proceeds is attributable to punitive damages and interest, which are taxable under section 61. Therefore, the burden is on petitioners to prove that there is substantial authority for their reporting position.

Respondent pled in his answer that petitioners negligently failed to report any portion of the settlement payment as gross income for 1991 and, therefore, are liable for the section 6662 penalty for negligence or disregard of rules or regulations. See sec. 6662(b)(1). This is a new matter; the burden of proof is

---

[17] Petitioners timely filed their return for calendar year 1991 on Oct. 15, 1992, and the return for their short taxable year 1992 on Mar. 15, 1993.

therefore on respondent to prove that petitioners were negligent or disregarded rules or regulations.  Rule 142(a).

Punitive Damages

The issue of whether punitive damages received in a tort or tortlike suit are excludable from income was resolved by the Supreme Court in O'Gilvie v. United States, 519 U.S. 79, 117 S. Ct. 452 (1996).  Before the Supreme Court's decision, the Courts of Appeals for the Fourth, Ninth, and Tenth Circuits had held that punitive damages are not excluded from income under section 104(a)(2), and the Court of Appeals for the Sixth Circuit had held they are excluded.[18]  Id. at ___, 117 S. Ct. at 454.  The Supreme Court granted certiorari to resolve the conflict among the circuits.  The Supreme Court held that punitive damages received in a tort suit for personal injuries were not received "on account of" personal injuries and, therefore, were not excluded from taxable gross income as defined during the years at issue.[19]  Id.

_____

[18]  See O'Gilvie v. United States, 66 F.3d 1550 (10th Cir. 1995), affd. 519 U.S. 79, 117  S. Ct. 452 (1996); Hawkins v. United States, 30 F.3d 1077 (9th Cir. 1994); Horton v. Commissioner, 33 F.3d 625 (6th Cir. 1994), affg. 100 T.C. 93 (1993); Commissioner v. Miller, 914 F.2d 586 (4th Cir. 1990), revg. and remanding 93 T.C. 330 (1989).

[19]  The Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, sec. 7641(a), 103 Stat. 2379, amended sec. 104(a) by adding the sentence "Paragraph (2) shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness."  OBRA sec. 7641(b)(2), 103 Stat. 2379, provided the amendment shall not apply to any amount
(continued...)

It is clear from the Supreme Court's decision that the issue of whether punitive damages received in a tort suit are excluded under section 104(a)(2) was unresolved at the time petitioners filed their returns for 1991 and 1992.

Furthermore, before the decision in O'Gilvie v. United States, supra, this Court decided Estate of Moore v. Commissioner, T.C. Memo. 1994-4, revd. and remanded 53 F.3d 712 (5th Cir. 1995). In Estate of Moore, we held, citing Threlkeld v. Commissioner, 87 T.C. 1294 (1986), and Roemer v. Commissioner, 716 F.2d 693 (9th Cir. 1983), that punitive damages received in a settlement of a lawsuit for malicious prosecution and invasion of privacy may be excluded from gross income pursuant to section 104(a)(2).

The Court of Appeals for the Fifth Circuit reversed Estate of Moore v. Commissioner, supra, holding that punitive damages awarded under Texas law are not intended to compensate plaintiffs for injury and are therefore not excludable under section 104(a)(2). Estate of Moore v. Commissioner, 53 F.3d at 715-716.

After we decided Estate of Moore, but before it was reversed, this Court decided Robinson v. Commissioner, 102 T.C.

_____

<sup>19</sup>(...continued)
received  pursuant to any suit filed on or before July 10, 1989. Petitioners filed suit in 1985 and are therefore within the exception to the amendment.

The Supreme Court decided the issue in O'Gilvie v. United States, 519 U.S. 79, 117 S. Ct. 452 (1996), upon the preamendment version of sec. 104(a)(2); the holding is therefore applicable to petitioners in this case.

116, 125-126 (1994), in which we stated:

> Under section 104(a)(2), gross income does not include
> the amount of any damages received (whether by suit or
> agreement) on account of personal injuries or sickness.
> From that section, and the regulations thereunder, we
> understand that damages received through a settlement
> of a lawsuit are excludable from gross income only if
> the damages were received on account of a "tortlike
> personal injury".  For this purpose, no distinction is
> drawn between tortlike personal injuries that are
> physical versus tortlike personal injuries that are
> nonphysical (i.e., psychological).  Thus, for example,
> damages are excludable from gross income under section
> 104(a)(2) if the damages were received pursuant to a
> settlement of a tortlike personal injury that resulted
> in: * * * punitive damages, Horton v. Commissioner, 100
> T.C. 93, 96 (1993); see also Miller v. Commissioner, 93
> T.C. 330, 337-342 (1989), revd. 914 F.2d 586 (4th Cir.
> 1990).  [Some citations omitted; emphasis added.]

As the lawsuit in the Robinson case included an award for
mental anguish, as well as punitive damages, we allocated a
percentage of the settlement amount to punitive damages and held
that the taxpayers could exclude that percentage from their gross
income under section 104(a)(2).  Id. at 136.  The Court of
Appeals for the Fifth Circuit, citing Estate of Moore v.
Commissioner, 53 F.3d 712 (5th Cir. 1995), revg. and remanding
T.C. Memo. 1994-4, reversed that part of our decision.  Robinson
v. Commissioner, 70 F.3d at 37 & n.4.

It is clear from these decisions that, until Estate of Moore
v. Commissioner, supra, was reversed, this Court was of the
opinion that taxpayers residing in Texas could exclude punitive
damages from income under section 104(a)(2).  We therefore find
that there was substantial authority for petitioners' reporting

position with respect to the punitive damages portion of the settlement amount.

Because of our finding that there was substantial authority for petitioners' reporting position, we need not address the issue of whether they were negligent in not reporting the punitive damages as income.

Accordingly, we find that petitioners are not liable for the section 6662(a) penalty for the portion of the underpayment of tax attributable to the punitive damages portion of the settlement amount.

Interest

Petitioners did not report any of the amount of the settlement proceeds that they received in 1991 as interest income. Respondent determined that a portion of the settlement amount is attributable to interest. Petitioners have presented no argument to support their reporting position on this issue, other than their assertion that section 104(a)(2) excludes the entire settlement amount.

In Kovacs v. Commissioner, 100 T.C. 124 (1993), affd. per curiam without published opinion 25 F.3d 1048 (6th Cir. 1994), we stated that we had last analyzed this issue in Aames v. Commissioner, 94 T.C. 189 (1990), in which we held that interest was not excludable under section 104(a)(2). In Aames, we drew a distinction between the damages and the interest on the damages, noting that the nature of interest is that it is paid because of

the delay in the receipt of a principal amount (the damage award). Kovacs v. Commissioner, supra at 129.

Furthermore, in Kovacs, we stated that the issue of the excludability of damages and the interest awarded thereon first arose in Riddle v. Commissioner, 27 B.T.A. 1339 (1933), which held, applying the predecessors of sections 61(a) and 104(a)(2), that interest was not part of damages and is includable in income. We also stated that since Riddle was decided in 1933, we have found no cases which suggest that interest paid on an award of damages received on account of personal injury is excludable under section 104(a)(2).

Finally, we observed that since Riddle was decided, the exclusion for personal injury damages has been reenacted and amended numerous times; nevertheless, the statute continues to exclude only "damages" and omits any reference to "interest", which implies a continuing acceptance by Congress of the existing interpretation of the exclusion.

Accordingly, we find that there was no substantial authority for petitioners' reporting position for the interest portion of the settlement amount they received in 1991.

Reasonable Cause and Good Faith Exception

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position with respect to that portion and that the taxpayer acted

in good faith with respect to that portion.  Sec. 6664(c)(1).

The determination of whether a taxpayer acted with reasonable cause and good faith within the meaning of section 6664(c)(1) is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's efforts to assess the taxpayer's proper tax liability. Id.  Reliance on the advice of a professional (such as an attorney or an accountant) does not necessarily demonstrate reasonable cause and good faith.  Reliance on professional advice, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.  Id.

Petitioners assert that they are not liable for any section 6662(a) penalty, because they relied upon the advice of their attorneys and their certified public accountant in reporting their income.

Petitioner testified that at different times he asked Branton, who was hired to represent petitioner in his personal injury lawsuit, Thomas Weir (Weir), a tax attorney from San Antonio, and Bill Elms (Elms), petitioners' certified public accountant, if the settlement amount was taxable.  Petitioner testified that all told him that none of the settlement amount was taxable.

Branton testified that he did not consider himself to be a

Federal tax lawyer. In response to a question by the Court, Branton stated that whenever a client asked him whether an item was taxable, his response has always been that he is not a tax lawyer, and that the client should get a tax lawyer. Thus, petitioners could not reasonably and in good faith rely upon Branton regarding the taxability of the settlement amount. See sec. 1.6664-4(b)(2), Example (1), Income Tax Regs.

Petitioner testified that he consulted with a tax attorney, Weir. Petitioner was not certain whether he spoke with Weir on the phone or consulted with him in person. Nor was petitioner certain of what documents he provided Weir. We cannot assume the testimony of absent witnesses would have been favorable to petitioner. Rather, the normal inference is that it would have been unfavorable. Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioner testified that he consulted with his accountant, Elms. Elms testified that in his initial interview with petitioner they talked extensively about the lawsuit. When Elms prepared petitioners' Federal income tax return for 1991, petitioners were involved in a bankruptcy proceeding and had given their only copy of the settlement agreement to that court. Elms therefore never saw a copy of the settlement agreement. Petitioner did provide Elms with a copy of the Texas district

court's charge to the jury and the jury's answers to the interrogatories submitted to them. This document lists the amounts the jury awarded on each of the charges on which petitioner brought suit; it does not, however, indicate that prejudgment or postjudgment interest is to be provided on the amounts.

Elms testified that at the time he prepared petitioners' return, it was his understanding that punitive damages awarded on a personal injury case were not taxable. Elms was concerned whether the award included some interest income; however, he concluded that no part of the amount received would be considered interest income.

Petitioner signed the partial settlement agreement; therefore, he knew that Harte-Hanks agreed to make a settlement payment in part for all of the postjudgment interest on the first $22 million of liability. Petitioner knew the actual damages totaled $11,500,000, he knew that Columbia and Hudson were not liable to pay anything unless the total award exceeded $12 million, and he knew that Columbia and Hudson paid $3 million to settle their potential liability. Therefore, petitioner knew that the settlement agreement contained pertinent information that was not included in the document he provided Elms.

Petitioner, in possession of pertinent information, may not claim good faith and reasonable cause when he stands mute while his tax adviser in ignorance of such information comes to an

incorrect opinion.

We therefore find that petitioners are liable for the section 6662(a) penalty for the portion of any underpayment of the tax required to be shown on the return that is due to not reporting the interest portion of the settlement amount as income.

Due to our finding that petitioners are liable for the accuracy-related penalty for the substantial understatement of tax, we need not address the issue of whether they are liable for the accuracy-related penalty for negligence or disregard of rules or regulations. See sec. 1.6662-2(c), Income Tax Regs.

To reflect the foregoing,

Decision will be entered

under Rule 155.