The district court did not address plaintiffs' argument on the merits. Rather, the court simply concluded that the enrolled bill doctrine, which "precludes judicial inquiry from going behind the legislation to examine the circumstances under which it was passed," prohibited the court "from inquiring into the manner in which the [Act] was enacted." 543 F.Supp. at 1279. This was error.

While the enrolled bill rule fully applies to challenges raised against the validity of an Arizona statute, *Hernandez v. Frohmiller,* 68 Ariz. 242, 259, 204 P.2d 854, 865 (1949); *see also Field v. Clark,* 143 U.S. 649, 672–73, 680, 12 S.Ct. 495, 497–500, 36 L.Ed. 294 (1892), it has no application to plaintiffs' contention that the bill is void on its face under the rule of *de la Fuente.* The enrolled bill doctrine is intended to forestall judicial inquiry into procedural irregularities occurring prior to the enactment of bills, not inherent defects in bills as enrolled. The challenge here is based not on whether there was truly a vote of the majority in favor of the Act, or whether the Act was reported out of "X" committee as the parliamentary rules of the Arizona legislature may require, but whether the enrolled bill, itself, is void. The bill, as enrolled, refers to certain extrinsic documents. If those documents (maps on file in a particular office) did not exist on the date of enactment, the provisions of the bill dependent on those documents are void. To determine whether the duly enrolled bill is valid, the court must look at the documents from which the enrolled bill itself purports to derive its meaning.

The enrolled bill doctrine, therefore, does not foreclose our inquiry; upon inquiry, however, we conclude that the bill is valid. The plaintiffs state in their briefs that the maps describing the four initial active management areas were, in fact, on file in the Secretary's office on June 12, 1980, the date on which the governor of Arizona signed the bill into law. The landowners conceded as much at oral argument. Consequently, the bill, as enrolled, was not void for an improper reference to extrinsic documents.[5]

### III

We affirm the judgment of the district court sustaining the validity of the Act.

AFFIRMED.

---

Paul F. ROEMER, Jr. and Marcia E. Roemer, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 82–7695.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 1983.

Decided Sept. 22, 1983.

---

John Gigounas, San Francisco, Cal., for petitioners-appellants.

Jay W. Miller, Washington, D.C., for respondent-appellee.

Before ALARCON, CANBY, and REINHARDT, Circuit Judges.

ALARCON, Circuit Judge:

Paul F. Roemer Jr. (Roemer) and Marcia E. Roemer appeal a decision of the United States Tax Court upholding a determination of deficiencies for their 1975 taxable year. Marcia E. Roemer is a party solely because she signed a joint income tax return with her spouse.

We must decide whether the defamation of an individual constitutes a personal injury for purposes of I.R.C. § 104(a)(2) (personal injury damages excludable from gross income). As we disagree with the tax court's treatment of the lump-sum award of damages in a defamation suit, we reverse.

FACTS

Paul F. Roemer Jr. started his own insurance business in 1952 in Oakland, California, where he had lived all his life. In order to build clientele, Roemer became a member of numerous social, civic and professional organizations. By the mid-1960's, he enjoyed an excellent personal and professional reputation in the community. His gross annual income had risen to approximately $300,000 (about one-half of which represented his net income).

In 1965, Roemer applied for an agency license from Penn Mutual Life Insurance

Company (Penn Mutual). In the course of reviewing Roemer's application, Penn Mutual requested a credit report from Retail Credit Company (Retail Credit). Retail Credit prepared the report and sent it to Penn Mutual and other insurance companies.

The credit report was grossly defamatory. Roemer's honesty was questioned. In addition, the report falsely stated that Roemer neglected his client's affairs, that he was recently fired from his position as president of an insurance firm, and that he intentionally defaced property belonging to others. Roemer demanded a retraction of the report. Retail Credit's purported retraction, however, contained further defamatory innuendos. Roemer was denied agency licenses to sell life insurance by Penn Mutual and other companies as a direct result of Retail Credit's report. His general reputation in the community where he resides and works also suffered because most of his clients were also his friends.

Roemer brought an action in a California court for libel under section 45 of the California Civil Code. Section 45 provides as follows: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." In his complaint for libel Roemer alleged that the defendant's defamatory publication was done "with intent to damage his reputation, and to injure him in his business profession and occupation." Roemer's attorney argued to the jury that in fixing damages the jury should consider that prior to the defamation the plaintiff had an excellent character and that his reputation in both the insurance industry and his personal life was excellent. In closing argument, the jury was told that Roemer had lost $136,000 in prospective income as the result of the libel. The jury found that Retail Credit had committed libel and

awarded Roemer compensatory damages of $40,000 and punitive damages of $250,000.[1] The judgment was upheld on appeal in *Roemer v. Retail Credit Co.,* 44 Cal.App.3d 926, 119 Cal.Rptr. 82 (1975). At trial the only defense was that of a qualified privilege claimed by the defendant under California Civil Code, section 47, subdivision 3 (a communication, without malice, between interested persons is privileged and therefore not defamation).

The jury was not asked to specify whether the damages were awarded as compensation for injury to Roemer's personal or professional reputation, nor did the jury allocate the award between Roemer's personal injury and his economic loss. The jury was instructed, however, that in determining the amount of actual or compensatory damages, it could "take into consideration the grief, anguish, mental suffering, mortification and humiliation which Plaintiff has undergone and suffered by reason of the Defendant's publication." The jury was also told that in awarding general and compensatory damages it could consider "the prominence of the Plaintiff in the community in which he lives, his social standing, his family status or any mental suffering proximately resulting from the defamation."

On Roemer's 1975 federal tax return, he reported $16,020 of the damages awarded in the defamation action as income. The Commissioner of Internal Revenue determined that the entire judgment received by Roemer should have been included in gross income with a deduction for all costs and attorneys' fees and assessed a deficiency of $32,980 against Roemer. The tax court, in an opinion by Judge Dawson reviewed by the court with three judges dissenting, upheld the Commissioner's determination. The tax court ruled that: (1) the compensatory damages were not excludable from gross income under I.R.C. § 104(a)(2), because the taxpayer had failed to establish that the compensatory damages were received for injury to his personal reputation; (2) the punitive damages were also includa-

---

1. This was actually the second verdict in favor of Roemer. The original judgment in the libel action had been reversed on appeal because of an erroneous jury instruction.

ble in gross income, since the tax court found that the compensatory damages were intended to reimburse the taxpayer for injury to his professional reputation; (3) both the compensatory and the punitive damages were taxable as ordinary income; and (4) the issue whether the costs were excludable from gross income as a recovery of capital or includable and deductible under I.R.C. § 212 was moot in the context of this case. *Roemer v. Commissioner,* 79 T.C. 398 (1982).

ANALYSIS

A. *Compensatory Damages*

1. *Tax Treatment of Personal Injury Damages*

■ I.R.C. § 61(a) defines gross income as "all income from whatever source derived." All realized accessions to wealth are presumed to be taxable income, unless the taxpayer can demonstrate that an acquisition is specifically exempted from taxation. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 430, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955) (Congress intended to tax all gains except those specifically exempted).

Since 1918 Congress has expressly excluded from gross income tort damages received on account of personal injuries.[2] Revenue Act of 1918, § 213(b)(6), 40 Stat. 1066. An individual who wins a personal injury suit is usually given a lump-sum award that includes an amount for items that ordinarily would be taxable, such as lost income. Although it might be logical to allocate a lump-sum award between its excludable and taxable components, the Commissioner has long excluded from income the entire monetary judgment. *See* Sol.Op. 132, I–1 C.B. 92, 93 (1922) (rights invaded and money value are incomparable, cannot tax any portion of sum received). The rationale behind the exclusion of the entire award is apparently a feeling that the injured party, who has suffered enough, should not be further burdened with the practical difficulty of sorting out the taxable and nontaxable components of a lump-sum award. Note, *Taxation of Damages Recoveries from Litigation,* 40 Cornell L.Q. 345, 346 (1955).

The dispositive issue on this appeal is whether Roemer's lump-sum recovery of damages in his defamation action against Retail Credit is excludable from gross income under I.R.C. § 104(a)(2) as damages received "on account of personal injuries." The tax court found that the defamatory statements predominantly resulted in a loss of income to Roemer caused by damage to his professional reputation. The court held that damages received in a defamation action are includable in gross income to the extent that they are measured by the effect on an individual's professional reputation. Damages are excludable from gross income to the extent a taxpayer can show that the damages, including amounts for lost income, were received for an injury to the individual's personal reputation.

■ Whether the tax court drew a proper distinction between personal reputation and professional reputation for purposes of I.R.C. § 104(a)(2) is a question of law subject to *de novo* review on appeal. I.R.C. § 7482(a); *Estate of Franklin v. Commissioner,* 544 F.2d 1045, 1047 n. 3 (9th Cir.1976). This court may modify or reverse a decision of the tax court that is not in accordance with the law. I.R.C. § 7482(c)(1). We reverse because we have

---

**2.** It was thought that there was no gain and therefore no income as income was then defined by the Supreme Court. *Eisner v. Macomber,* 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920) (income is gain derived from capital or labor). Revenue Act of 1918, § 213(b)(6), 40 Stat. 1066, discussed in H.Rep. No. 767, 65th Cong., 2d Sess. (1918), reprinted in 1939–1 (Part 2) C.B. 86, 92. The Supreme Court later made it clear that the *Eisner* definition of income was not exclusive and that other realized accessions to wealth may be taxable income. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955) (punitive damages for fraud and antitrust violations are taxable income). Since there is no tax basis in a person's health and other personal interests, money received as compensation for an injury to those interests might be considered a realized accession to wealth. Nevertheless, Congress in its compassion has retained the exclusion (now codified at I.R.C. § 104(a)(2)).

concluded that the tax court's analysis of this matter confuses a personal injury with its consequences and illogically distinguishes physical from nonphysical personal injuries.

When an individual recovers damages for a physical personal injury, the lump-sum award is not allocated between the personal aspects of the injury and the economic loss occasioned by the personal injury, nor is the taxpayer precluded from use of § 104(a)(2) when the predominant result of the injury is a loss of income. However, when the injury is nonphysical, as is defamation, the majority of the tax court would require the taxpayer to allocate an award between the excludable and the otherwise taxable components of the damages. 79 T.C. at 405–06.

The relevant distinction that should be made is between personal and nonpersonal injuries, not between physical and nonphysical injuries. I.R.C. § 104(a)(2) states that damages received on account of *personal* injuries are excludable; it says nothing about *physical* injuries. "[T]he words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses." *Crane v. Commissioner*, 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947). The ordinary meaning of a personal injury is not limited to a physical one. Indeed, the Service has long said that certain nonphysical injuries are personal injuries and that all damages received for nonphysical personal injuries are excludable from gross income. Sol.Op. 132, I–1 C.B. 92 (1922) (damages for alienation of affections, defamation of personal character, and surrender of child custody rights are damages for invasion of personal rights and not income).

Since the damages at issue here were awarded to the taxpayer after the trial of a defamation action,[3] we must look to the nature of the tort of defamation to determine whether the award should have been reported as gross income. *See Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970) (characterization of stock appraisal litigation expenses depends on the origin of the claim litigated); *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110, 113 (1st Cir.1944) (analysis of antitrust damages; "In lieu of what were the damages awarded?"), *cert. denied*, 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944).

### 2. The Tort of Defamation

Since there is no general federal common law of torts (*Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)) nor controlling definitions in the tax code, we must look to state law to analyze the nature of the claim litigated. *United States v. Mitchell*, 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406 (1971) (quoting *Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932) (state law creates legal interests; federal law determines when and how to tax). In order to determine the nature of Roemer's claim, we must analyze the defamation action as it developed in state law.

The first California legislature, in preparation for California's admission to the Union in 1850, expressly repealed the laws in force up to that time in favor of adoption of the English common law as modified by numerous statutes governing crimes, procedures and corporations passed during that 1849–50 legislative session. 1850 Cal.Stat. 219; Kleps, *The Revision and Codification of California Statutes 1849–1853*, 42 Calif.L. Rev. 766, 766 (1954). After 20 years of statutory revision and agitation for an accessible arrangement of the statutes, Cali-

---

**3.** We note in passing that we do not have here the problem, as in some settlement awards, of determining whether or not the settlement was on account of personal injuries by looking at the intent of the payor. *See Agar v. Commissioner*, 290 F.2d 283 (2d Cir.1961); *Knuckles v. Commissioner*, 349 F.2d 610 (10th Cir.1965).

We also thank appellee for bringing to our attention the case of *Fono v. Commissioner*, 79 T.C. 680 (1982), *appeal docketed*, No. 83–7077 (9th Cir. Feb. 2, 1983). From our reading of the tax court's statement of facts, it appears that the facts of *Fono* are distinguishable from the matter before us now, but we leave it to another panel to analyze the issues raised in *Fono*.

fornia in 1872 adopted David Dudley Field's code drafted for the New York legislature. Field's principal purpose in advocating and drafting the Civil Code was to systematize the common law rules, which consisted of the English common law with some American modifications. Harrison, *The First Half-Century of the California Civil Code,* 10 Calif.L.Rev. 185, 186–87 (1922). Thus, the English law of defamation became a part of California state law and a significant influence upon the future development of defamation law.

For well over a thousand years Anglo-American law provided some measure of protection for one's good name. For example, the laws of Alfred, which were probably compiled in the late ninth century, provided that one found guilty of public slander be punished by "no lighter penalty than the cutting off of his tongue." 1 *English Historical Documents* 407, 413 (D. Whitelock 2d ed. 1979) (law no. 32). Mutilation of the defamer was not the usual remedy, however, for apart from Alfred's law, Anglo-Saxon customary law generally gave no remedy for defamation. 8 W. Holdsworth, *A History of English Law* 335 (2d ed. 1937). Defamation was left to the jurisdiction of canon law, which, being primarily interested in saving the soul of the sinner, required the defamer, while wrapped in a white shroud and holding a lighted candle, to acknowledge the false allegations and beg the pardon of the injured party. Since the only remedy was this public apology, the defamation action served only to vindicate the good name of the injured party. Lovell, *The "Reception" of Defamation by the Common Law,* 15 Vand.L.Rev. 1051, 1052 (1962).

As the middle class grew and began to demand monetary compensation for the injury done to their purses as a consequence of defamation, merchants first turned for relief to their own court of Piepoudre (so named for the "dusty feet" of the travelling merchants who gathered at the great fairs). L. Eldredge, *The Law of Defamation,* § 3 n. 15 (1978). Later, the court of Star Chamber also required the defendant in a defamation action to pay compensation to the plaintiff. Defamation was regarded as a crime over which the Star Chamber had jurisdiction in order to prevent dueling and other breaches of the peace. 5 W. Holdsworth, *A History of English Law,* 209–12 (2d ed. 1945).

By the sixteenth century, when the common law courts began to express an interest in allowing monetary compensation for defamation, the procedure of these courts was rigidly well-defined by a complex system of pleading with strict and technical rules. Defamation came into the common law in the form of an action on the case; this meant that the damage caused to the person defamed was the principal purpose of the action rather than the injury which led to the damage. Because the law considered the damage and not the injury as the cause of action, special rules of pleading and proving damages were developed. 8 Holdsworth, *A History of English Law,* 335, 347 (2d ed. 1937).

After the decline of the ecclesiastical courts and the abolishment of the court of Star Chamber in 1641, the common law courts found it necessary to combine the actions of these courts into one body of law of defamation. The judges of the seventeenth century who reformed the law of defamation combined doctrines from the Star Chamber with action on the case from the common law courts such that the common law courts' misapprehension of the cause of action as one for damages rather than for an injury continues to haunt us today. 8 Holdsworth, *A History of English Law,* 335, 347, 360–61 (2d ed. 1937); *see also* 5 Holdsworth at 212.

Thus, the law of defamation in California is an unhappy tangle of illogical rules derived from its haphazard historical development. Although the civil code has been extensively amended, the definitions of defamation and its component torts of libel and slander have basically remained as they were when enacted in 1872. Cal.Civ.Code §§ 44, 45, 46 (West 1982). In California, tort actions continue the common law courts' emphasis on the effects of the defa-

mation. There are a myriad of rules for when and what sort of damages may or must be proved with the applicable rules varying according to the form of the defamatory statements made (oral or written) and the content of the statements. Cal.Civ. Code §§ 44–48.5; 4 B. Witkin, *Summary of California Law* §§ 271–326 (8th ed. 1974) (summary of rules of defamation).

There is nevertheless a unifying theme to defamation law as evidenced by the fact that the California defamation statutes appear in the Civil Code at "Division 1. Persons. Part 2. Personal Rights." The first statute in part 2, section 43 of the Civil Code, recognizes a general personal right to be protected from defamation. In contrast, California law also provides for related torts of disparagement or trade libel that will remedy an attack on the quality of the plaintiff's products or services. *See, e.g., Gudger v. Manton,* 21 Cal.2d 537, 541, 134 P.2d 217, 220 (1943) (citing Rest. Torts, § 624, for definition of slander of title, also known as disparagement of title); *Erlich v. Etner,* 224 Cal.App.2d 69, 73, 36 Cal.Rptr. 256, 258 (1964) (citing Rest. Torts, §§ 626, 627, for definition of trade libel).

It is sometimes difficult to draw the line between disparagement and defamation. For example, the same statement may attack a person's character as well as disparage a property interest. Such a plaintiff has a choice of actions under California law. He or she may file a defamation action for the attack on his or her personal character or a disparagement action for the attack on a property or business interest, or both the defamation and the disparagement actions. *Rosenberg v. Penney Co.,* 30 Cal.App.2d 609, 620–21, 86 P.2d 696, 702–03 (1939) (statements concerning goods may also reflect on the honesty of the seller). However difficult it may be to decide whether a disparagement or a defamation suit is appropriate in any given situation, defamation

concerns the person of the plaintiff, while disparagement concerns the plaintiff's goods. *Shores v. Chip Steak Co.,* 130 Cal. App.2d 627, 630, 279 P.2d 595, 597 (1955) (libel concerns person or reputation of plaintiff, trade libel relates to plaintiff's goods).

Although there are different types of defamation actions (libel or slander) depending on the form of the defamatory statements, all defamatory statements attack an individual's good name.[4] This injury to the person should not be confused with the derivative consequences of the defamatory attack, *i.e.,* the loss of reputation in the community and any resulting loss of income. The nonpersonal consequences of a personal injury, such as a loss of future income, are often the most persuasive means of proving the extent of the injury that was suffered. The personal nature of an injury should not be defined by its effect.

As Professor Wigmore said in discussing by what evidence character is to be proved:

Character and Reputation are as distinct as are destination and journey.

. . . The truth is that reputation is merely one of three possible modes [along with personal opinion and specific acts] of proving actual Character. Even if it were the exclusive mode, by reason of considerations excluding other modes, it would be as reasonable to identify it with actual character as to identify the Red Line railroad with the town Millville simply because the other railroads to Millville have been abandoned or blockaded.

Character, then, is to be considered, for the purposes of relevancy, as the *actual* moral or psychical *disposition,* or sum of traits, and is to be distinguished from reputation or any other source of evidencing Character.

---

**4.** Although a corporation may sue for certain types of defamation, a corporation by its very nature cannot suffer a personal injury. A corporation is a business entity and not a human being; thus, a corporation can only be protected against false statements affecting its trade or business. *DiGiorgio Fruit Corp. v. American Federation of Labor,* 215 Cal.App.2d 560, 571, 30 Cal.Rptr. 350, 356 (1963) (a corporation cannot be hurt in a personal sense, but language damaging its business reputation is actionable).

1 J. Wigmore, *Evidence* § 52 at 447–48 (3d ed. 1940).

So, too, a defamatory attack on one's character should not be confused with the damage to a person's reputation that flows from that injury. Frequently, as a result of defamatory statements attacking one's character, the individual suffers an impairment of his or her relationships with others. While some of these relationships may be personal and some may be professional, all of the harm that is done flows from the same personal attack on the defamed individual. The evidence presented in the state court demonstrated that Roemer suffered an impairment of both his personal and professional relationships as a result of Retail Credit's report that falsely attacked his good name. The evidence is uncontradicted that Roemer received damages as the result of filing an action for defamation.

Since, as discussed above, the defamation of an individual is a personal injury under California law, the compensatory damages received by Roemer in his defamation suit against Retail Credit are excludable from gross income under § 104(a)(2), as would be the compensatory damages received on account of any personal injury.

### B. *Punitive Damages*

 Normally, an amount awarded for punitive damages is includable in gross income as ordinary income. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); *Thomson v. Commissioner,* 406 F.2d 1006, 1008 (9th Cir.1969) (punitive damages taxable as ordinary income). Nevertheless, the Commissioner liberally interprets § 104(a)(2) to exclude punitive damages as well as all compensatory damages where there has been a personal injury. Rev.Rul. 75–45, 1975–1 C.B. 47. Therefore, according to the Commissioner's own interpretation, the punitive damages received by Roemer on account of his § 104(a)(2) personal injury (the defamation) are excludable from gross income.

### C. *Reimbursement of Costs*

 The tax court regarded the issue whether the reimbursement of costs were excludable or includable and deductible under § 212 as moot. Under our analysis of defamation as a personal injury action, litigation expenses would not be deductible under § 212, because there is no production of income. Furthermore, such a deduction should be specifically disallowed under § 265 since the amount of damages received are wholly exempt from income under § 104(a)(2). *Church v. Commissioner,* 80 T.C. 1104 (1983), (defamation suit litigation expenses nondeductible under § 265(1) to extent allocable to tax exempt income).

Nevertheless, the effective result is the same for the taxpayer. To the extent litigation expenses were allocable to interest received on the award, they were deductible under § 212(1) as expenses paid for the production of income. To the extent the expenses are allocable to the tax-exempt damages, although not deductible, they are excludable from gross income as a recovery of capital. The taxpayer here was reimbursed for what was his already. Furthermore, Roemer incurred these expenses in order to make himself whole again, not to generate income for himself. In considering the deductibility of expenses, the Supreme Court has said that characterization of litigation expenses depends on the origin of the claim litigated. *Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). Applying the same standard to the taxability of a reimbursement of litigation expenses would lead to the conclusion that this reimbursement, being for expenses incurred on account of a personal injury, should be excluded from gross income under the rationale that the taxpayer is not receiving income but is being made whole after a personal injury.

### CONCLUSION

As we find that Roemer's defamation suit was brought to remedy a personal injury and that the award should not be differentiated on the basis of the resulting damage to his personal life and his professional career, all of Roemer's compensatory damages are excludable from gross income under I.R.C.

§ 104(a)(2) and the decision of the tax court is reversed.