T.C. Memo. 2000-24

UNITED STATES TAX COURT

ALAIN AND MONIQUE MASSOT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10086-98.                    Filed January 19, 2000.

<u>Cynthia C. Smith</u> and George A. Berman (specially
recognized), for petitioners.

<u>Christine Colley</u> and <u>Maureen T. O'Brien</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined a $191,580 deficiency in
petitioners' 1992 Federal income tax.  The sole issue for decision
is whether the $600,000 Alain Massot (petitioner) received in 1992

as a result of the termination of his employment is excludable from petitioners' gross income pursuant to section 104(a)(2).

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference.

Background

Petitioners resided in Arlington, Massachusetts, at the time they filed their petition. They timely filed a joint 1992 income tax return.

Petitioner was born and raised in Brittany, France. He studied at the Institute of Chemistry of Paris, Sorbonne University, receiving a degree in chemical engineering in 1970.

Millipore, S.A. and Millipore Corp.

As of September 22, 1992, petitioner was the corporate vice president for marketing of Millipore Corp. (Millipore), a Fortune 500 company, and a member of its 12-person executive committee.

Millipore's business originally was based on the manufacturing and sale of precise membrane filters capable of removing bacteria and other harmful particles so as to purify water, air, gas, and

other fluids in the pharmaceutical, microelectronic, food and beverage, and aircraft industries. Later, Millipore diversified into the manufacturing and sale of precision instrumentation, chromatography, and the synthesis of DNA and peptides.

Petitioner began working for Millipore, S.A., a French subsidiary of Millipore, in 1971 as a technical sales representative in third-world countries. He was promoted numerous times--first as area manager for the USSR, the Middle East, and Africa, then to sales manager, and in 1979, to general manager and vice president of Millipore, S.A., where he was responsible for the company's European membrane division.

Millipore, S.A. contributed to a retirement account for petitioner in France.

Relocation to the United States

On May 7, 1986, petitioner was promoted to senior vice president of worldwide sales for Millipore (for the membrane division). Petitioner's promotion was announced in a general distribution memorandum.[1] Petitioner's promotion required his and

---

[1] General distribution memoranda were used by Millipore to communicate quickly with its employees worldwide. Pursuant to Millipore's practice, such a memorandum would first be duplicated and distributed to employees in Millipore's Bedford, Massachusetts, headquarters, then faxed to the foreign subsidiaries with instructions for further dissemination to Millipore's worldwide employees. Subsequently, the memorandum would be delivered into the mailboxes of the individual employees, displayed on bulletin boards, and translated into foreign languages.

his family's relocation from Paris to Massachusetts. Petitioner ceased actively working for and receiving a salary from Millipore, S.A.; he did, however, continue to receive a French pension. (On February 2, 1996, petitioner became a U.S. citizen.) In his new position, petitioner managed the sales operations of Millipore's subsidiaries. Approximately 2 years later, petitioner was promoted to president of Millipore's analytical group.

On December 22, 1989, petitioner was promoted to president of MilliGen/Biosearch, a startup division of Millipore (with $16 million in sales and $20 million in losses). This promotion was announced in a general distribution memorandum, which stated in relevant part:

> This election is evidence of the critical role Alain plays in the leadership of the corporation, and of the diverse management responsibilities he has successfully undertaken in his many years of service with Millipore. He has been an important leader directing the evolution of our European business. He has also been instrumental in the success of the Analytical Group, where he strengthened the management team and helped groom his own successor as president. And now, as president of MilliGen/Biosearch, he has assumed one of our most difficult managerial assignments in a business that is vital to our future.

On August 23, 1991, petitioner was promoted to Millipore's corporate vice president of marketing. Petitioner was responsible for marketing, promotion, public relations, merger and acquisitions, new business development, and long-range planning for the entire company. (Petitioner held this position at the time he

was terminated, see infra.) This promotion was announced in a general distribution memorandum.

During petitioner's tenure at Millipore, the company grew from approximately $24 million in annual sales (in 1971) to $766 million (by 1992). Petitioner played a significant role in building the company.

As of early 1992, petitioner viewed Millipore and its 5,000 worldwide employees like family. Likewise, he was highly regarded in the company. Petitioner anticipated that eventually he would become president of Millipore.

Petitioner's Termination

During an early morning meeting on September 22, 1992, John Gilmartin, chief executive officer and chairman of the board of Millipore, informed petitioner that his employment with Millipore was being terminated effective immediately; Mr. Gilmartin did not provide petitioner with any reason for this decision.[2] Petitioner was shocked; he became pale and began trembling. Mr. Gilmartin handed petitioner a letter containing Millipore's proposed termination offer. Under the provisions of that letter, petitioner would continue to receive his salary, benefits, and exercise certain stock options for a period of 18 months after his departure

---

[2] The procedure Mr. Gilmartin followed in terminating petitioner was not the procedure Millipore managers had been instructed to follow. These procedures included giving the employee notice and an explanation for the termination.

on the condition he did not accept a position with a competitor during that period. The letter further stated that should petitioner accept employment with a competitor, Millipore reserves the right to terminate petitioner's monthly salary payments as well as his right to exercise his stock options.

Shortly after the meeting with Mr. Gilmartin, Millipore's vice president of human resources instructed petitioner to turn in his company badge and keys. After doing so, petitioner met with an out-placement representative and then was asked to leave the building. Petitioner took a few personal items from his desk, placed them in a box, and walked out of the building. Petitioner was very distressed and considered suicide.

At midday, Millipore employees from around the world telephoned petitioner, inquiring about a general distribution memorandum (issued that day) that announced his departure from the company. The memorandum read:

> The history of Millipore is full of individuals who have shaped the success of our company. Alain Massot most certainly has been among the most significant of these people. In recent months, however, it has become increasingly apparent to Alain that his interests were not being fully satisfied within our organization.
>
> I am sorry to report that Alain will be leaving Millipore this month. I have every confidence that he will be greatly successful in whatever endeavors he chooses.
>
> Alain departs Millipore with my sincere thanks and with the best wishes of all of us.

After receiving a copy of the memorandum from a colleague, petitioner became even more distraught because it falsely implied that he (1) had voluntarily resigned, and (2) was dissatisfied with Millipore.

On September 25, 1992, petitioner sent Mr. Gilmartin a letter in which he (1) objected to the circulation of the September 22 memorandum, and (2) explained that he was still considering the company's termination offer.

Effect on Petitioner

Petitioner's physical and emotional state deteriorated as a consequence of his termination. He gained approximately 20 pounds, his cholesterol level increased, he was diagnosed as having diabetes, and he lost interest in his marital relations. He became obsessed with his employment termination; he avoided leaving his home and was unable to sleep.

Before his termination, petitioner negotiated deals for Millipore all over the world. Following the termination, he lacked the confidence required for a successful job interview. He felt he had been defamed and humiliated before his colleagues and the entire industry in which he had worked. Petitioner was never offered an executive position with a company comparable to Millipore. Ultimately, in January 1999, he was offered, and accepted, a position as vice president for sales and marketing at a relatively small company.

The Negotiations

Petitioner engaged counsel both in the United States and France for advice as to his legal rights as a consequence of his employment termination. His French attorney advised him that under French law, in order to obtain recovery against Millipore, he would have to institute a suit in France against Millipore, S.A. (French law prohibited abusive dismissal or termination without cause, and provided for compensatory damages for emotional distress, indignity, humiliation, and injury to reputation. Such damages were not taxable under French law.) Petitioner's French counsel informed petitioner that he had a bona fide claim under French law.

Additionally, petitioner was informed that potentially he had legal rights under a French collective bargaining agreement governing Millipore, S.A.'s managers and engineers ("convention collective Ingénieurs et Cadres de la Métallurgie"), which applied to Millipore employees in France as well as those transferred to the United States.

Petitioner's U.S. counsel informed petitioner that he had several possible causes of action under Massachusetts law, including invasion of privacy, defamation, negligent and intentional infliction of emotional distress, and negligent firing.

On October 2, 1992, petitioner's U.S. counsel wrote Mr. Gilmartin formally rejecting Millipore's termination offer, as set forth in Mr. Gilmartin's September 22, 1992, letter. In the

October 2, 1992 letter, petitioner's counsel referred to petitioner's rights under the Millipore S.A. collective bargaining agreement and stated that petitioner should receive: (1) Cumulative damages of $977,814, plus (2) 60 percent of his salary during the period the noncompetition clause would be in effect, and (3) damages for termination without cause (the French equivalent of outrageous dismissal). The $977,814 cumulative damages were calculated as follows:

| | |
|---|---|
| 10 months'salary (based on seniority) | $190,000 |
| 3 months' salary (failure to give notice) | 57,000 |
| 2 years' salary (termination without cause) | 456,000 |
| French pension fund contribution | 30,000 |
| Millipore participation plan contribution | 15,077 |
| Millipore savings plus match | 4,237 |
| Millipore incentive (restricted) stock options | 175,500 |
| Millipore non-qualified stock options | 50,000 |
| TOTAL | 977,814 |

This letter was referred to Geoffrey Nunes, Millipore's general counsel and senior vice president. After reviewing the letter, Mr. Nunes requested the parties to meet. Millipore anticipated that petitioner would institute suit in Massachusetts for claims based in tort, as enumerated in petitioner's counsel's October 2 letter, and had potential causes of action in France. Millipore's management recognized that petitioner's claims posed the risk of significant financial exposure to the company.

The parties met on October 9, 1992. During the course of the meeting, a heated discussion ensued. Mr. Nunes initially took the position that petitioner did not have any French or U.S. law claims

against Millipore or Millipore, S.A. Petitioner's U.S. counsel countered by threatening legal action. Ultimately, the parties were able to negotiate the basic terms of a settlement agreement (the agreement). The agreement, in relevant part, provided:

3. Upon the parties' execution of this Settlement Agreement Millipore Corporation will pay in satisfaction of the obligations undertaken hereunder by Millipore Corporation and Millipore S.A. to Mr. Massot the sum of seven hundred fifty-thousand dollars ($750,000), with the sum of six hundred thousand dollars ($600,000) to be paid within 24 hours of the signing of this Settlement Agreement * * *. Millipore Corporation will also deposit in an escrow account * * * within 24 hours of the signing of this Settlement Agreement, the remaining sum of one hundred and fifty thousand dollars ($150,000). * * * It is expressly understood and agreed that the entire sum set forth in this paragraph is damages for personal injury allegedly suffered by Mr. Massot on account of termination without cause by Millipore Corporation and Millipore S.A., damaged reputation and emotional distress caused by Millipore Corporation, which allegations Millipore Corporation and Millipore S.A. deny.

4. Millipore Corporation and Millipore S.A. are paying Mr. Massot $750,000 which Mr. Massot accepts as consideration for this settlement agreement and as damages for alleged personal injury (and not as remuneration for services performed, for which he precisely waives any claim), including the full release of all claims. Mr. Massot further agrees that he will not apply for or claim unemployment compensation benefits provided by the French government based on his past employment with Millipore S.A.

5. The parties shall treat all payments * * * as payment in settlement of claims for personal injury and shall not treat or report these payments in any way for tax purposes or otherwise as compensation for services rendered.

*       *       *       *       *       *       *

7. Mr. Massot agrees that from and after the date of this Settlement Agreement through December 31, 1993,

he will not be directly or indirectly employed by, consult for, or in any way provide employee, consultant or contract work or services for, or serve as a director of, or have any interest as owner or stockholder in, any company, partnership, or other business association * * * which is engaged in competition with the lines of business of Millipore Corporation and Millipore S.A. existing on September 30, 1992, in any territory in which Millipore Corporation or Millipore S.A. was then doing business * * *

8. The only remedy of Millipore Corporation and Millipore S.A. for breach by Mr. Massot of his obligations set forth in Paragraph 7 will be the forfeiture of the $150,000 which would otherwise be paid to Mr. Massot on January 1, 1994. * * *

*       *       *       *       *       *       *

13. This Settlement Agreement shall not in anyway [sic] be construed as an admission by Millipore Corporation or Millipore S.A. of liability, responsibility and/or any wrongdoing against Mr. Massot which makes Millipore Corporation or Millipore S.A. liable to Mr. Massot in any way, and Millipore Corporation and Millipore S.A. disclaim any liability to Mr. Massot. * * *

*       *       *       *       *       *       *

15. This Settlement Agreement shall not in any way be construed as an admission by Mr. Massot of liability, responsibility and/or any wrongdoing against Millipore Corporation or Millipore S.A. which makes Mr. Massot liable to Millipore Corporation or Millipore S.A. in any way, and Mr. Massot disclaims any liability to Millipore Corporation and Millipore S.A.

The agreement was executed on November 30, 1992. On the same day, Mr. Nunes sent a letter to petitioner's U.S. counsel in which he stated Millipore's position that "in the event that any tax authority * * * successfully disputes the treatment of sums paid to

Mr. Massot as 'damages,' the parties agree that each will be responsible for its (or his) own tax liability."

Settlement Payment

In accordance with the agreement, on November 30, 1992, Millipore transferred (by wire) $600,000 in French francs to petitioner's French bank account and deposited $150,000 into an escrow account at the Bank of Boston.

Treatment of Settlement Proceeds

Millipore did not report the $600,000 settlement proceeds as "wages, tips, other comp." on the 1992 Form W-2 it issued to petitioner; petitioners did not report the $600,000 settlement proceeds as income on their 1992 tax return.

OPINION

The sole issue for decision is whether the $600,000 petitioner received as a result of the termination of his employment is excludable from petitioners' 1992 gross income as section 104(a)(2) damages received on account of personal injury or sickness.

Except as otherwise provided, gross income includes income from all sources. See sec. 61; Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-430 (1955). Petitioners' settlement proceeds constitute gross income unless expressly excepted by another Code provision. See Commissioner v. Schleier, 515 U.S. 323, 328 (1995); Rozpad v. Commissioner, 154 F.3d 1, 3 (1st Cir. 1998), affg. T.C. Memo. 1997-528.

Pursuant to section 104(a)(2), gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness". The applicable regulations provide that "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs. A tort is a "'civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages.'" United States v. Burke, 504 U.S. 229, 234 (1992)(quoting Keeton et al., Prosser and Keeton on the Law of Torts 2 (5th ed. 1984)). The availability of compensatory remedies is critical, see Commissioner v. Schleier, supra at 333, and such remedies are intended to redress intangible elements of injury deemed important (even though not pecuniary in their consequences), including emotional distress, pain and suffering, impairment of reputation, personal humiliation, and mental anguish. See, e.g., United States v. Burke, supra at 235-236. Thus, in order to exclude damages from gross income pursuant to section 104(a)(2), a taxpayer must prove: (1) The underlying cause of action is based upon tort or tort type rights, and (2) the damages were received on account of personal injuries or sickness. See Commissioner v. Schleier, supra at 336-337; Rozpad v.

<u>Commissioner</u>, <u>supra</u> at 5; <u>Cade v. Commissioner</u>, T.C. Memo. 1999-394. We address both requirements.

<u>Tort or Tort Type Rights</u>

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement controls whether such amounts are excludable from gross income under section 104(a)(2), and not the validity of the claim. See <u>United States v. Burke</u>, <u>supra</u> at 237; <u>Woodward v. Commissioner</u>, 397 U.S. 572 (1970); <u>Fabry v. Commissioner</u>, 111 T.C. 305 (1998). The crucial question is "in lieu of what was the settlement amount paid"? <u>Bagley v. Commissioner</u>, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). Determining the nature of the claim is a factual inquiry. See <u>Fabry v. Commissioner</u>, <u>supra</u>; <u>Robinson v. Commissioner</u>, 102 T.C. 116, 127 (1994), affd. in part, revd. in part, and remanded on another issue 70 F.3d 34 (5th Cir. 1995); <u>Burditt v. Commissioner</u>, T.C. Memo. 1999-117. State law determines the nature of the legal interests involved. See, e.g., <u>Roemer v. Commissioner</u>, 716 F.2d 693, 697 (9th Cir. 1983), reversing on another issue 79 T.C. 398 (1982). Federal law supplies the rule of decision in determining whether a given payment is subject to Federal income tax. See <u>Helvering v. Stuart</u>, 317 U.S. 154, 162 (1942).

In determining the purpose of the payment, we begin by looking at the language in the settlement agreement. The language contained

in an agreement will be respected to the extent the settleemnt agreement is entered into in an adversarial context, at arm's length, and in good faith. See, e.g., Fono v. Commissioner, 79 T.C. 680, 694 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); Srivastava v. Commissioner, T.C. Memo. 1998-362. "If the settlement agreement lacks express language stating that the payment was (or was not) made on account of personal injury, then the most important fact in determining how section 104(a)(2) is to be applied is 'the intent of the payor' as to the purpose in making the payment." Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988).

Here, paragraph 3 of the agreement provides that the $750,000 petitioner is to receive from Millipore constitutes "damages for personal injury allegedly suffered by Mr. Massot on account of termination without cause by Millipore Corporation and Millipore, S.A., damaged reputation and emotional distress caused by Millipore Corporation".

We are satisfied that a portion of the settlement proceeds paid by Millipore to petitioner was to settle tort claims for personal injury. Relying on both Massachusetts and French law, the parties understood that petitioner had colorable and bona fide causes of action based on tort or tort type rights (such as defamation, invasion of privacy, libel, outrageous dismissal, intentional or negligent infliction of emotional distress, and

termination without cause).   We believe that Millipore took petitioner's claims seriously, particularly those in Massachusetts.[3]

The manner in which Millipore terminated petitioner potentially could be considered tortious. The nature of petitioner's relationship to the company and the details concerning the termination of his employment were highly personal. Publishing the general distribution memorandum globally (which falsely indicated that petitioner was dissatisfied with his job and had resigned) without petitioner's consent, to 5,000 employees of a Fortune 500 company on the morning of petitioner's firing, could be deemed a tactic by Millipore to force petitioner to leave quickly and

---

[3]      Possible causes of action in Massachusetts included: (1) Invasion of privacy; disclosure of private facts about an employee to other employees is a tort under the Right of Privacy Act, Mass. Gen. Laws, ch. 214, sec. 1B (1984); Bratt v. IBM Corp., 467 N.E.2d 126, 135-136 (Mass. 1984) (test for determining whether communication of personal information about an employee by an employer violates the statutory right of privacy requires a balancing of the "employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure"); disclosure of private information about an employee to other employees constitutes sufficient publication to maintain a libel action, see Bander v. Metropolitan Life Ins. Co., 47 N.E.2d 595 (Mass. 1943); (2) defamation pursuant to Mass. Gen. Laws, ch. 231, sec. 92 (1986); if a plaintiff shows that a defendant in an action for libel acted with malice in making a defamatory statement, the plaintiff may recover even if the statement is true, see Shaari v. Harvard Student Agencies, Inc., 691 N.E. 2d 925, 927 (Mass. 1998); damages for defamation and libel include mental suffering, harm to reputation and standing in the community, mental anguish, and personal humiliation; (3) negligent and intentional infliction of emotional distress caused by the manner and effect of discharge, see Agis v. Howard Johnson Co., 355 N.E.2d 315 (Mass. 1976); (4) unfair termination; and (5) negligent firing.

quietly.  By virtue of Millipore's manner of discharge, petitioner was humiliated.  And petitioner's mental anguish was so severe that he considered suicide.

We are mindful that pursuant to paragraph 3 of the agreement, Millipore denied that petitioner suffered personal injuries or that it bore any responsibility for causing them.  In our opinion, this disclaimer is merely boilerplate language; that is, standard operating procedure for a settlement.

Although we do not believe that the entire $750,000 was paid for personal injury as recited in the agreement, see infra, we are satisfied that the agreement was in other respects entered into in an adversarial setting, at arm's length, and in good faith.  Hostile negotiations ensued; these negotiations were undertaken in the parties' good faith belief that they had to either resolve their bona fide dispute or litigate petitioner's claims.  See, e.g., Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994).  Millipore wanted to limit its financial exposure. Mr. Nunes took into consideration (a) what it was going to cost Millipore to defend petitioner's claim, (b) what was the likelihood of Millipore's losing, and (c) what the maximum cost to Millipore would be if it lost.  He was more concerned about the dollar cost to Millipore than the merits of petitioner's claims.

We conclude that, from Millipore's viewpoint, the $750,000 settlement was partly attributable to a desire to avoid a lawsuit

in Massachusetts seeking personal injury damages for damaged reputation and emotional distress caused by Millipore's conduct in terminating petitioner's employment. Moreover, we believe Millipore recognized that petitioner's termination gave rise to potential causes of action under French law for termination without cause (a tort, in nature) as well as a potential recovery under the collective bargaining agreement covering managers and engineers.

Personal Injuries or Sickness

To prevail, petitioners must also prove that the proceeds received from Millipore were on account of personal injuries or sickness.  Personal injury includes both tangible and intangible harms.  See Commissioner v. Schleier, 515 U.S. at 330 n.4.  These harms include pain and suffering, emotional distress, and harm to reputation or other consequential damages, such as embarrassment, humiliation, and mental anguish.  See United States v. Burke, 504 U.S. at 239; Knevelbaard v. Commissioner, T.C. Memo. 1997-330.

On the basis of the documentary evidence and credible testimony in this case, we conclude that petitioner suffered serious and prolonged emotional and physical injury arising from Millipore's termination. The abrupt manner in which Millipore terminated petitioner dramatically affected him, resulting in the decline of his physical and emotional well-being. He suffered emotional distress (embarrassment, humiliation, and mental anguish) manifested by both mental and physical symptoms, as well as harm to his

reputation (i.e., difficulty in finding a comparable position). See Church v. Commissioner, 80 T.C. 1104, 1108 (1983). Without a doubt, here a link between petitioner's firing and his personal injury exists. See sec. 104(a)(2); Commissioner v. Schleier, supra at 330. The Massachusetts law upon which petitioner's causes of action were based allows recovery for personal injury and intangible harms petitioner suffered. See Agis v. Howard Johnson Co., 371 Mass. 140, 355 N.E.2d 315 (1976).

As previously stated, despite the language in the agreement which states that the entire $750,000 is for personal injury, we do not believe that the entire amount payable to petitioner was on account of personal injuries or sickness. Rather, we believe that petitioner's counsel placed such language in the agreement in an attempt to have the moneys petitioner was to receive from Millipore come within the purview of section 104(a). Millipore did not object to such language because from Millipore's viewpoint the language was inconsequential.

In our opinion, the settlement represented (1) severance compensation, (2) compensation for petitioner's agreement not to accept employment with a competitor of Millipore, and (3) compensation for personal injuries or sickness suffered by petitioner as a result of his firing.

Considering all the facts as revealed by the record, we conclude that 45.6 percent of the overall $750,000 settlement

package was for severance compensation and petitioner's agreement not to accept employment with a competitor of Millipore, and 54.4 percent was on account of petitioner's personal injuries or sickness arising from his firing.[4]  Our reasoning for this allocation is as follows.

When petitioner's employment with Millipore was terminated on September 22, 1992, petitioner's annual salary was approximately $228,000.  Thus, the 18 months' severance portion of Millipore's offer was approximately $342,000.  Reducing the overall $750,000 settlement package by $342,000 leaves $408,000, or 54.4 percent, for the personal injury portion of the settlement package.

On the basis of this 54.4-percent allocation, we conclude that $326,400 of the $600,000 petitioner received in 1992 was paid on account of personal injuries or sickness and is excludable from petitioners' gross income pursuant to section 104(a)(2), and the balance of $273,600 is taxable.

---

[4]    As stated, petitioner's claims against Millipore did not sound solely in tort; petitioner's claims were for breach of the employment contract as well.  Millipore initially offered petitioner a severance package including 18 months' salary.  We infer that the settlement petitioner accepted in lieu of that offer incorporated the element of severance pay, though not designated as such in the agreement.

In reaching our conclusions herein, we have considered all arguments presented and, to the extent not discussed above, find them to be without merit.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.