Malcolm E. BOLTON, Respondent,

v.

THE DEPARTMENT OF HUMAN
SERVICES, State of Minnesota,
et al., Petitioners, Appellants.

No. C0–94–1711.

Supreme Court of Minnesota.

Dec. 15, 1995.

Hubert H. Humphrey, III, Atty. Gen., Lucinda E. Jesson, Asst. Atty. Gen., St. Paul, for appellants.

Malcolm E. Bolton, Clitheral, pro se.

Minnesota Employment Law Council, Robert R. Reinhart, Kevin M. Lindsey, Minneapolis, for amicus curiae.

OPINION

STRINGER, Justice.

In this matter, respondent Malcolm E. Bolton (Bolton) alleges he was defamed by conduct when a Fergus Falls Regional Treatment Center (FFRTC) supervisor accompanied him to the exit door of the FFRTC, without a word spoken, immediately following Bolton's discharge from employment. Thus we are invited to extend the tort of defamation to conduct alone. Summary judgment in favor of the appellants was reversed by the court of appeals. Because we decline the invitation to recognize a cause of action for defamation by conduct alone, we reverse the court of appeals and reinstate summary judgment for the defendants.

Bolton was employed as a social work specialist at the Fergus Falls Regional Treatment Center from September 6, 1978 until he was terminated on January 28, 1991. During that time, he provided social work services for developmentally disabled residents of the treatment center, including advocacy for patients and advising their families on their legal rights. His immediate supervisor was Eileen Eastman, the Supervisor of Social Work. Eileen Eastman reported to William Klein, the Director of Professional Services, who in turn reported to Elaine Timmer, the Chief Executive Officer.

On September 19, 1990, FFRTC staff, including Bolton, held a meeting where it was decided to discharge one of Bolton's clients, L.K., to a group home on December 10. Although Bolton did not note his dissent on the discharge form, he was unhappy with the decision to discharge L.K. because he believed there had been inadequate inquiry into L.K.'s best interests. Nonetheless, he did

not follow the recognized administrative process to seek review of the discharge decision.

It apparently was Bolton's opinion that a court-appointed special guardian should review the L.K. decision, so on October 4, 1990, he requested that the Department of Human Services provide him a signed release to allow him to provide private data about L.K. to a local attorney he had hired to work on a guardianship petition. The DHS denied his request. When Bolton later notified Otter Tail County Social Services that he intended to petition the probate court for special guardianship of L.K., Otter Tail County informed Bolton's supervisors of his intentions.

The FFRTC management staff believed that Bolton's petition created a conflict of interest in violation of the FFRTC's code of ethics, and Eastman advised him of that on October 23. Notwithstanding, on the same day, Bolton gave Eastman a memo indicating that he intended to proceed with the guardianship petition. To avert what he acknowledged was "a possible conflict of interest" if he remained her social worker, he requested that the L.K. case be reassigned to a different social worker so that he could continue action on the petition. Eastman denied his request, believing that a conflict would exist whether or not Bolton was the social worker on L.K.'s case. L.K.'s discharge was reaffirmed at a November 9 planning meeting also attended by Bolton, and on November 20, Bolton filed a petition with the Otter Tail County probate court to be appointed the general guardian of L.K.

On December 5, Bolton attended a fact-finding meeting with Eastman, Klein, Assistant FFRTC Administrator Mike Ackley, and two representatives from the Minnesota Association of Professional Employees, at which the FFRTC management concluded that Bolton's petition created a conflict under the center policy, and issued Bolton an oral directive to stop pursuing the guardianship. In addition to that directive, which was confirmed in writing five days later, Timmer personally encouraged Bolton to cease and desist in his pursuit of the guardianship petition in a December 20 memorandum. Bolton refused to withdraw the petition, believing that he lacked the legal power to do so.

When the guardianship petition caused the planned discharge of L.K. to be delayed, Timmer ordered an investigation, and based on the conclusions of the investigation Timmer decided to terminate Bolton's employment.

On January 28, 1991, Timmer called a meeting with Bolton, Klein, and the personnel director Douglas Boyer. At the meeting, she informed Bolton that the decision had been made to terminate him, and she gave him a letter setting forth the reasons. The letter focused on the conflict of interest and Bolton's failure to terminate the guardianship efforts. Timmer then instructed Bolton to collect his personal belongings and leave the facility immediately. She also instructed Klein, pursuant to FFRTC practice relating to terminated employees, to escort Bolton out of the building. Klein accordingly escorted Bolton back to his office and waited while Bolton obtained boxes and removed his personal belongings. During the walk, which lasted less than a minute, Klein intentionally walked behind Bolton in order not to draw attention to their activities and did not communicate with Bolton. From Bolton's office, Klein escorted him to the front door of the building, again walking behind. The walk took approximately 30–45 seconds, and again no words were spoken.

According to Douglas Boyer, ordering discharged employees to collect their belongings and leave the FFRTC immediately, and having a supervisor discreetly escort them in doing so, is FFRTC practice for the purpose of protecting confidential files, data, and other property of clients and the center. Klein acknowledged that residents and staff members could have seen him escorting Bolton out of the building, but he stated that he could not recall anyone making any comments or asking questions about the incident. One staff member, however, did witness Bolton walking down the hallway toward his office carrying a box. He asked Bolton what he was doing, to which Bolton responded that he had been fired. The co-worker said that he observed Klein sitting in Bolton's office and "sensed a tense atmosphere."

Since the termination, Bolton claims to have suffered anxiety attacks, de-

pression, and night terrors. Approximately 18 months after he was discharged, Bolton filed a 14–count complaint in Ramsey County in connection with his discharge. After Bolton withdrew several of the claims, the trial court granted summary judgment on those that remained. The court of appeals affirmed the grant of summary judgment with respect to all claims except the claim for defamation by action and negligent infliction of emotional distress, the claims that arose out of Klein's behavior when he escorted Bolton out of the FFRTC. *Bolton v. Department of Human Servs.*, 527 N.W.2d 149, 157 (Minn.App.1995). Because we conclude under these facts that conduct alone is insufficient to sustain a defamation claim, we reverse the court of appeals and reinstate summary judgment for the appellants.

Minnesota has long recognized the elements of a defamation action: a false statement, communication to a third party, and a tendency to harm the claimant's reputation and lower the claimant in the estimation of the community. *See, e.g., Lewis v. Equitable Life Assurance Soc'y.*, 389 N.W.2d 876, 886 (Minn.1986); *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). Respondent, however, cites *Svendsen v. State Bank of Duluth*, 64 Minn. 40, 65 N.W. 1086 (1896), as authority for this court having recognized an action for defamation where conduct was the mode of communication. In *Svendsen* we concluded that a bank's dishonor of a merchant's checks was slander per se, *Id.* at 42, 65 N.W. at 1087, but we do not find the case applicable here. Even though no words were spoken in *Svendsen*, and no particular statements were alleged, the conduct was accompanied by written words: the checks were returned to the payees for want of funds, and it was that notification that caused the plaintiff's harm. *Id.* In substance, although words and conduct may support each other's meanings in the defamation context, *see Blakeman v. Blakeman* 31 Minn. 396, 399, 18 N.W. 103, 104 (1884), Minnesota has never recognized defamation by conduct alone.

Both the respondent and the court of appeals find support for defamation by conduct in other jurisdictions. For example, the court of appeals cites the Maryland Court of Appeals for having "recognized that conduct may defame the reputation and good name of a person." *See General Motors Corp. v. Piskor*, 27 Md.App. 95, 113, 340 A.2d 767, 780 (1975), *rev'd on other grounds*, 277 Md. 165, 352 A.2d 810 (1976); *see also M & S Furniture Sales Co., Inc. v. DeBartolo Corp.*, 249 Md. 540, 544, 241 A.2d 126, 128 (1968). Maryland, however, has since retreated from its position in a case factually similar to the one before us here. *Gay v. William Hill Manor*, 74 Md.App. 51, 55–56, 536 A.2d 690, 692, *cert. denied*, 312 Md. 601, 541 A.2d 964 (1988). In *Gay*, the plaintiff had been terminated from her nurse position in a nursing home and was escorted to her locker by three supervisors who watched her clean out her locker, then escorted her out of the building and to her car. *Id.* The appellate court affirmed the lower court's order granting the defendant's motion for judgment notwithstanding the verdict, because it "[did] not believe that the mere act of an employer escorting an employee from the building after termination of employment, without more, constitutes a defamatory publication." *Id.* at 56, 536 A.2d at 693. In most other states that have allowed an action for defamation by conduct, the behavior has tended to rise to the level of "dramatic pantomime:" that is, an interplay of words and conduct that provide a clearly discernible account of the making of a false statement about the aggrieved to a third party. *See, e.g., Alaska Statebank v. Fairco*, 674 P.2d 288, 294 (Alaska 1983); *Bonkowski v. Arlan's Dep't Store*, 383 Mich. 90, 97, 174 N.W.2d 765, 767 (1970); *Gowin v. Hazen Mem. Hosp. Ass'n*, 311 N.W.2d 554, 558 (N.D.1981); *Bennett v. Norban*, 396 Pa. 94, 97, 151 A.2d 476, 478 (1959); *Starobin v. Northridge Lakes Dev. Co.*, 94 Wis.2d 1, 5, 287 N.W.2d 747, 749 (1980).

The law of defamation is a complex mix of competing interests, and has not been viewed by legal scholars as either rational or clear in application:

> [T]here is a great deal of the law of defamation which makes no sense. It contains anomalies and absurdities for which no legal writer ever has had a kind word * * *. The explanation is in part one of historical accident and survival, in part one

of the conflict of opposing ideas of policy in which our traditional notions of freedom of expression have collided violently with sympathy for the victim traduced and indignation at the maligning tongue.

\* \* \*

One heritage of [the] haphazard development [of the law of defamation] is the set of arbitrary and illogical rules which surround both [libel and slander]. \* \* \* No very comprehensive attempt ever has been made to overhaul and untangle this entire field of law, and, unhappily, there seems to be none in prospect.

W. Page Keaton et al., *Prosser and Keaton on the Law of Torts,* § 111, at 771 (5th ed. 1984). Determining whether defamation has occurred is further complicated by the fact that the tort is based on communication of a statement that can be interpreted by the declarant to have one meaning but to have quite a different one to the recipient. In the employment context, as here, the task of applying these legal tests becomes even more difficult, where job performance evaluations are part of the everyday work environment, and where a supervisor must occasionally take disciplinary action against a subordinate who is perceived to have fallen short in job performance.

Therefore, in the context of these facts, where there is no word spoken or conduct other than a simple escorting of the plaintiff to the exit door upon his termination, we conclude that as a matter of law respondent was not defamed. Because the negligent infliction of emotional distress claim depended entirely on the finding of defamatory invasion of respondent's rights, *see Bolton,* 527 N.W.2d at 157, we need not address that claim.

Reversed and summary judgment in favor of the appellants is reinstated.