T.C. Memo. 2000-342


UNITED STATES TAX COURT


RONALD N. AND KAREN M. GROSS, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3440-98.                     Filed November 7, 2000.


Mark A. Pridgeon, for petitioners.

Blaine C. Holiday, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  Respondent determined deficiencies in
petitioners' Federal income taxes for taxable years 1993 and 1994
of $120,226 and $39,914, respectively.  The sole issue for
decision[1] is whether petitioners may exclude from gross income

---

[1]The only other issues are computational.

under section 104(a)(2)[2] three sets of payments received during the years at issue pursuant to a settlement agreement.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioners are married and resided in Brooklyn Park, Minnesota, at the time the petition was filed. References to petitioner are to Ronald N. Gross.

Petitioner's Employment at Okabena Co.

Petitioner is a certified public accountant. In October 1977, petitioner accepted a position as staff accountant at Okabena Co. (Okabena). In 1980, petitioner was promoted to vice president of administration, and in 1990, petitioner was promoted to executive vice president of administration. At no time during petitioner's employment did Okabena have more than 15 employees.

On April 6, 1993, a female employee at Okabena made a sexual harassment claim against petitioner to the president of Okabena, Bruce Lueck. That same day, Mr. Lueck informed petitioner of the allegations, and, upon advice of counsel, Okabena began an investigation. On April 7 and 8, 1993, Okabena's outside legal counsel interviewed each female employee of Okabena regarding

_____

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

these allegations. Petitioner was instructed not to discuss the investigation with anyone and to continue normal business operations. At the conclusion of its investigation, Okabena determined that sufficient evidence existed to conclude that petitioner had conducted himself improperly, that he no longer could manage the employees effectively, and that he was subject to termination.

On the morning of April 9, 1993, petitioner retained the legal services of James Roth to represent petitioner in connection with the investigation of the alleged sexual harassment. At a conference that morning, petitioner and Mr. Roth discussed the allegations against petitioner and a possible resolution of them. After this meeting, petitioner submitted a handwritten letter of resignation to Mr. Lueck.

Over the weekend of April 10 and 11, 1993, petitioner worked at Okabena to review tax files and clean up his desk. On April 10, 1993, petitioner and Mr. Lueck discussed petitioner's situation in petitioner's office at Okabena. During the discussion, Mr. Lueck informed petitioner that petitioner's resignation was unnecessary and that he should reconsider it.

On April 12, 1993, petitioner met with Mr. Lueck and withdrew his resignation. At the same time, petitioner requested an employment contract with Okabena and submitted a proposed handwritten employment contract for consideration. At this

meeting, Mr. Lueck asked petitioner to leave the Okabena offices and not to return until further notice. Petitioner departed and never returned to Okabena.

The Negotiations

From April 15 to June 21, 1993, petitioner, Mr. Roth, Okabena officials, and Okabena's attorneys engaged in negotiations to resolve the matter and to formulate a severance package for petitioner. Several meetings were held regarding the terms and conditions of petitioner's termination from Okabena. The negotiations between Okabena and petitioner were adversarial.

At the first meeting, on or about April 15, 1993, petitioner and Mr. Roth met with Mr. Lueck, Robert Dayton, chairman of the board of Okabena, and Okabena's outside counsel. Okabena presented petitioner with the option either of being terminated or of submitting a voluntary resignation and accepting 12 months of severance pay. Petitioner rejected the offer and made a counteroffer proposing, among other things, that a portion of any funds paid be allocated to personal injuries in order to enable him to exclude such proceeds under section 104. Okabena asked petitioner to turn over his keys and not to return to Okabena's offices.

Additional negotiating sessions and conferences regarding the proposed settlement were held on April 16, 19, 20, and 21, 1993. On April 21, 1993, Mr. Lueck sent petitioner a termination

letter confirming that Okabena had terminated petitioner's employment effective April 20, 1993.

Throughout the negotiations, petitioner threatened litigation against Okabena and specifically mentioned a potential claim for age discrimination, referring to a pattern of alleged age discrimination at Okabena. During these meetings, petitioner also mentioned claims of wrongful termination and defamation of character. Petitioner never filed a complaint against Okabena in any court.

The Settlement Agreement

On May 12, 1993, Okabena's counsel sent petitioner a draft settlement proposal. After extended negotiations over the terms of the proposed settlement agreement, a final settlement agreement (settlement agreement) and two releases were signed on June 21 and 22, 1993.

Pursuant to the settlement agreement, both petitioner and Okabena agreed to release all claims that either party had or might have against the other. The settlement agreement acknowledged the following facts, among others:

> WHEREAS, Gross has alleged that certain matters relating to his employment with * * * [Okabena] and his separation from * * * [Okabena] give rise to legal claims against * * * [Okabena] for age discrimination; and

> WHEREAS, Gross claims that he is entitled to receive damages from * * * [Okabena] for loss of future income and for personal injuries, and to be reimbursed

by * * * [Okabena] for his attorneys' fees and costs; and

WHEREAS, * * * [Okabena] expressly denies that it may be liable to Gross on any basis or that it has engaged in any improper or unlawful conduct or wrongdoing against him * * *

The settlement agreement required Okabena to make several distinct categories of payments to or on behalf of petitioner. Three of those categories, severance payments, lump-sum payments, and liquidation payments, are at issue here.[3]

Severance Payments

Under paragraph 3(a) of the settlement agreement, Okabena agreed to make 18 monthly payments of $10,417, less all applicable withholding, beginning on May 1, 1993, and concluding on October 31, 1994 (severance payments). Petitioners included these severance payments in gross income and paid the applicable Federal income taxes on these amounts in 1993 and 1994. The severance payments form the basis of petitioners' claim that they overpaid their Federal income taxes in 1993 and 1994 and are entitled to a refund.

The Lump-Sum Payments

Under paragraph 3(b) of the settlement agreement, Okabena agreed to make two lump-sum payments to petitioner--one of $112,500 shortly after the settlement agreement was executed and

_____

[3]Okabena satisfied all its obligations under the settlement agreement.

a second payment of $100,000 on May 15, 1994 (lump-sum payments).
Petitioner excluded the lump-sum payments from gross income as
damages received on account of personal injuries.

The Liquidation Payment

Under paragraph 5(a) of the settlement agreement, Okabena
agreed to pay petitioner $516,907 for his interests in several
Okabena investment entities (liquidation payment). Okabena made
the required payment in 1993. Petitioner excluded the
liquidation payment from gross income as damages received on
account of personal injuries.

The Tax Clause

The settlement agreement also contained the following
provision with respect to the tax treatment of the payments made
to petitioner pursuant to the settlement agreement:

> 7. Payment of Taxes. The parties expressly
> acknowledge that the payments to be made to Gross under
> subparagraph 3(b) of this Agreement [the lump-sum
> payments] are intended solely as compensation for
> claimed damages on account of alleged personal injuries
> arising from an occurrence within the meaning of
> Section 104(a)(2) of the Internal Revenue Code, the
> administrative regulations promulgated thereunder, and
> applicable case law. No part of the payments to be
> made to Gross under subparagraphs 3(b) or 5(a) [the
> liquidation payment] is allocable to punitive damages,
> compensation for other claimed damages, or interest
> thereon. The Company makes no representation or
> warranty to Gross or his attorneys regarding the tax
> treatment or consequences of any payment made to Gross
> under this Agreement by the Internal Revenue Service or
> any other tax authority. Gross will be solely
> responsible for the payment of any and all taxes of
> whatever kind that may be due or payable from him in
> connection with any payment made to him under this

Agreement.  Gross agrees to indemnify and hold harmless the Company from any and all liens, actions, or claims on the part of the Internal Revenue Service or any other tax authority in connection with any payment made to Gross under subparagraphs 3(b) or 5(a) of this Agreement.  This indemnity and hold harmless agreement will apply as to the full amount of any such liens, actions, or claims, and as to the amount of any expenses incurred in connection therewith.

## The Release

The release signed by petitioner defined the universe of claims released by petitioner in the settlement agreement as follows:

"My Claims" means all of my existing rights to any relief of any kind from * * * [Okabena] or the Investments,[4] whether or not I now know about those rights including, but not limited to:

1.  all claims that arise out of or that relate to my employment or the termination of my employment with * * * [Okabena];

2.  all claims that arise out of or that relate to the statements or actions of * * * [Okabena] or the Investments;

3.  all claims for any alleged unlawful discrimination or any other alleged unlawful practices that arise out of or that relate to the statements or actions of * * * [Okabena] or the Investments, including, but not limited to, claims under the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Civil Rights Act of 1991, the National Labor Relations Act, the Employee Retirement Income Security Act, the Minnesota Human Rights Act, the Minnesota Workers' Compensation Act, and any

---

[4]"Investments" was defined as "any present or past investment entities managed by Okabena Company, and any person who acted on behalf of or on instructions from any present or past investment entities managed by Okabena Company."

federal or state wage and hour laws; and claims that * * * [Okabena] or the Investments engaged in conduct prohibited on any other basis under any federal, state, or local statute, ordinance, or regulation;

4. All claims for alleged unpaid compensation, expenses, and employee benefits; wrongful discharge; breach of contract; breach of implied contract; breach of a covenant of good faith and fair dealing; breach of fiduciary duty; promissory or equitable estoppel; defamation; intentional or negligent infliction of emotional distress; fraud; negligent misrepresentation; negligence; assault and battery; false imprisonment; invasion of privacy; interference with contractual or business relationships; and any other wrongful employment practices;

5. All claims for accountings, distributions, payments, and any other compensation from the Investments, except from Okabena Partnership V-8 and Energy Corporation E-2; and

6. All claims for attorneys' fees, liquidated damages, punitive damages, costs, and disbursements.

[Emphasis added.]

## The Notice of Deficiency

In his statutory notice of deficiency, respondent recharacterized the lump-sum payments as ordinary income taxable to petitioner when received in 1993 and 1994 and also determined that the liquidation payment was taxable to petitioner as proceeds from the sale or exchange of various capital assets; i.e., petitioner's interests in various Okabena partnerships and investments.

Petitioners timely petitioned this Court for redetermination of the deficiencies set forth in respondent's notice.  In their petition, petitioners contested respondent's determinations and further alleged that respondent erred in failing to determine that petitioners were entitled to a refund of overpayments of income taxes for 1993 and 1994 resulting from petitioners' reporting of the severance payments as gross income.

## OPINION

Gross income means all income from whatever source derived, unless excluded by law.  See sec. 61(a); sec. 1.61-1(a), Income Tax Regs.  Exclusions from income are construed narrowly, and taxpayers must bring themselves within the clear scope of the exclusion.  See Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); Mayberry v. United States, 151 F.3d 855, 859 (8th Cir. 1998); Dobra v. Commissioner, 111 T.C. 339, 349 n.16 (1998) (citing Graves v. Commissioner, 89 T.C. 49, 51 (1987), supplementing 88 T.C. 28 (1987)).  Petitioner bears the burden of proof with respect to whether he is entitled to an exclusion.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 104(a)(2) excludes from gross income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal

injuries or sickness".[5]  "The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs.

In order to exclude payments under section 104(a)(2) petitioner must show:  (1) The underlying cause of action giving rise to the recovery is based upon tort or tort type rights, and (2) the damages were received on account of personal injuries or sickness.  See Commissioner v. Schleier, supra at 337; Mayberry v. United States, supra at 858; Bagley v. Commissioner, 105 T.C. 396, 416 (1995), affd. 121 F.3d 393 (8th Cir. 1997).

The tax consequences of payments made pursuant to a settlement agreement depend on the nature of the claims that were the actual basis for settlement, not on the validity of those claims.  See Bagley v. Commissioner, supra at 406; Threlkeld v. Commissioner, 87 T.C. 1294, 1297 (1986), affd. 848 F.2d 81 (6th Cir. 1988); Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987); Seay v. Commissioner, 58 T.C. 32, 36-

---

[5]The Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1755, 1838, amended sec. 104(a)(2) to narrow the exclusion for personal injury damages received after Aug. 20, 1996, in tax years ending after that date.  Under the amendment, personal injury or sickness must be physical.  The amendment, however, does not apply to the years before us in this case and, therefore, has no bearing on our decision.

37 (1972); Burditt v. Commissioner, T.C. Memo. 1999-117. The proper inquiry is: In lieu of what were damages awarded? See Bagley v. Commissioner, supra at 406. Determination of the nature of the claim is factual and is made by examining the relevant facts and circumstances. See id.; Burditt v. Commissioner, supra.

## I. Were The Underlying Causes of Action Giving Rise to the Payments Based Upon Tort or Tort Type Rights?

The first prong of the Schleier test requires a taxpayer to prove the existence of a claim based upon tort or tort type rights. See Commissioner v. Schleier, supra at 337. We must decide, therefore, whether petitioner's alleged claims were tort or tort type claims and whether the claims were bona fide, but not necessarily valid or sustainable. See Pipitone v. United States, 180 F.3d 859, 862 (7th Cir. 1999); Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994). State law controls whether the nature of the claim is a tort or tort type right, and Federal law controls Federal tax consequences pertaining to such interests and rights. See Commissioner v. Tower, 327 U.S. 280, 288 (1946); Threlkeld v. Commissioner, supra at 1305-1306; Barnes v. Commissioner, T.C. Memo. 1997-25.

Petitioner asserts that two primary legal claims were the basis for his settlement with Okabena--defamation and age discrimination.

A. Defamation

The State of Minnesota recognizes a cause of action based on the tort of defamation. See Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 236 (Minn. 1998); Ferrell v. Cross, 557 N.W.2d 560, 562 (Minn. 1997); Bolton v. Department of Human Servs., 540 N.W.2d 523 (Minn. 1995). General or compensatory damages received by way of settlement for injury to personal reputation and health caused by defamatory statements are exempt from taxation. See Seay v. Commissioner, supra at 40; Hawkins v. Commissioner, 6 B.T.A. 1023 (1927).

Under well-settled Minnesota law, in order to establish a prima facie case of defamation, the plaintiff must show (1) a statement was communicated to someone other than the plaintiff, (2) the statement was false, and (3) the statement tended to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community. See Lewis v. Equitable Life Assurance Socy. of the U.S., 389 N.W.2d 876, 886 (Minn. 1986); Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980). "Slanders affecting the plaintiff in his business, trade, profession, office or calling are slanders per se and thus actionable without any proof of actual damages." Stuempges v. Parke, Davis & Co., supra at 255.

The record in this case establishes that petitioner made a bona fide claim of defamation against Okabena. Petitioner

testified that immediately following the allegation of sexual harassment, Okabena commenced an investigation into the matter, and each female employee at Okabena was interviewed by its outside counsel. Petitioner testified that when the female employees returned to the office, they were "totally pale and really shook up". At that point, petitioner felt his rights were violated. Petitioner immediately hired legal counsel and resigned the next day because he felt he no longer could manage the employees at Okabena effectively as a result of the damage to his reputation. The investigation, including the interviews of employees petitioner supervised, affected petitioner's personal and professional reputation adversely, and his relationships with employees quickly deteriorated.

Although petitioner could not point to a specific defamatory comment, petitioner's belief that he had been defamed was made in good faith and was not frivolous. In addition, because settlement negotiations began promptly after the harassment claim was made and the investigation was conducted, petitioner and his counsel had no opportunity to discover precisely what had been said and to whom. If litigation had been filed, that opportunity would have been available to petitioner and his counsel. The important fact here, however, is that petitioner asserted a nonfrivolous claim for defamation in good faith, and that claim

was taken into account by both Okabena and petitioner in negotiating their settlement agreement.

We find that petitioner had asserted a bona fide claim for defamation at the time the settlement agreement was executed; therefore, the first element of <u>Schleier</u> is met.[6]

B.  <u>Age Discrimination</u>

Petitioner asserts that his age discrimination claim was grounded upon the Minnesota Human Rights Act, Minn. Stat. Ann. secs. 363.01-363.15 (West 1991 & Supp. 2000), and not the Age Discrimination in Employment Act of 1967 (ADEA), Pub. L. 90-202, sec. 2, 81 Stat. 602, currently codified at 29 U.S.C. secs. 621-634 (1994), due to jurisdictional limitations of the ADEA.[7]

---

[6]Petitioner argued, in the alternative, that the first element of a defamation claim, i.e., that a statement was communicated to someone other than the plaintiff, may be met through the doctrine of "self-publication".  <u>Lewis v. Equitable Life Assurance Socy. of the U.S.</u>, 389 N.W.2d 876, 886 (Minn. 1986).  Generally, there is no publication where a statement is communicated directly to the plaintiff, who then communicates it to a third person.  Minnesota law, however, recognizes the doctrine of compelled self-publication and acknowledges that the publication requirement of a defamation action "may be satisfied where the plaintiff was compelled to publish a defamatory statement to a third person if it was foreseeable to the defendant that the plaintiff would be so compelled."  <u>Id.</u> at 888. In light of our holding, however, we need not address the merits of petitioner's alternative argument.

[7]The Age Discrimination in Employment Act of 1967 (ADEA), Pub. L. 90-202, sec. 2, 81 Stat. 602, currently codified at 29 U.S.C. secs. 621-634 (1994), prohibits claims against employers with fewer than 20 employees.  In contrast, age discrimination actions under the Minnesota Human Rights Act may be brought against employers with one or more employees.  See Minn. Stat.

(continued...)

Petitioner asserts that the Minnesota Human Rights Act is a broad statute that provides for tort or tort type remedies, including compensatory damages, punitive damages, and damages for mental anguish and suffering.

The U.S. Supreme Court has held that amounts received by a taxpayer in settlement of an age discrimination claim under the ADEA are not excludable from gross income under section 104(a)(2) because the ADEA provides no compensation "for any of the other traditional harms associated with personal injury". Commissioner v. Schleier, 515 U.S. at 335; see also United States v. Burke, 504 U.S. 229 (1992) (backpay awards in settlement of claims brought under title VII of Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 253, as amended, 42 U.S.C. secs. 2000e through 2000e-17 (1994), are not damages received on account of personal injuries within meaning of section 104(a)(2) and must be included in income because Act does not provide remedies for personal injuries). But cf. Bent v. Commissioner, 87 T.C. at 249 (gross income does not include damages received under 42 U.S.C. sec. 1983 claim based on violation of First Amendment rights to free speech). In Schleier, the Supreme Court concluded that monetary remedies under the ADEA are either of an "economic character" or liquidated damages, which serve no compensatory function.

---

[7](...continued)
Ann. sec. 363.01, subd. 17 (West 1991 & Supp. 2000). Okabena did not employ more than 15 at any time relevant to this proceeding.

Commissioner v. Schleier, supra at 336.  Thus, a recovery under the ADEA is not one "based upon tort or tort type rights."  Id.  In Schleier, the Court emphasized that "one of the hallmarks of traditional tort liability is the availability of a broad range of damages to compensate the plaintiff 'fairly for injuries caused by the violation of his legal rights.'"  Id. at 335; see also Mayberry v. United States, 151 F.3d at 859 ("the proper focus is the remedial scheme in the statute providing the cause of action and the nature of the relief available under the scheme").

In contrast, an age discrimination claim pursued under the Minnesota Human Rights Act appears to be "based upon tort or tort type rights."  Commissioner v. Schleier, supra at 336.[8]  The Minnesota Human Rights Act specifically provides for damages other than those of a purely economic nature.  For example, in all cases where there is a finding of unfair discrimination, as defined in Minn. Stat. Ann. sec. 363.03, subd. 1, the person against whom the complaint has been filed or issued shall pay a civil penalty to the State and compensatory damages to the aggrieved party in an amount up to three times the actual damages sustained.  See Minn. Stat. Ann. sec. 363.071, subd. 2 (West 1991

---

[8]"The provisions of the Minnesota Human Rights Act are liberally construed to accomplish its purposes."  Continental Can Co. v. State, 297 N.W.2d 241, 248 (Minn. 1980) (citing City of Minneapolis v. Richardson, 239 N.W.2d 197, 203 (Minn. 1976)).

& Supp. 2000). Damages for mental anguish or suffering, reasonable attorney's fees, and punitive damages also may be awarded to the aggrieved party. See id.[9] Thus, we conclude that the Minnesota Human Rights Act compensates an aggrieved party for "the other traditional harms associated with personal injury." Commissioner v. Schleier, supra at 336.

Under the Minnesota Human Rights Act, it is an unfair employment practice for an employer to discharge an employee because of age. See Minn. Stat. Ann. sec. 363.03, subd. 1(2)(b). In order to prove a prima facie case of age discrimination under Minnesota law, a plaintiff must show: (1) He was a member of a protected class,[10] (2) he was qualified for the position he held, (3) despite his qualifications, his position was terminated, and (4) a younger person was assigned to do his work. See Ward v.

---

[9]In an employment case involving discrimination, the statute also provides for:

> the hiring, reinstatement or upgrading of an aggrieved party, who has suffered discrimination, with or without back pay, admission or restoration to membership in a labor organization, or admission to or participation in an apprenticeship training program, on-the-job training program, or other retraining program, or any other relief the administrative law judge deems just and equitable. [Minn. Stat. Ann. sec. 363.071, subd. 2(a) (West 1991 & Supp. 2000).]

[10]Minn. Stat. Ann. sec. 363.01, subd. 3 (West 1991 & Supp. 2000) protects individuals over the age of majority, except for Minn. Stat. Ann. sec. 363.03, subd. 5 (West 1991 & Supp. 2000), which protects individuals over the age of 25 years.

<u>Employee Dev. Corp.</u>, 516 N.W.2d 198, 201 (Minn. Ct. App. 1994).
Minnesota law permits plaintiffs to use circumstantial evidence
to prove discriminatory intent.  See <u>Feges v. Perkins
Restaurants, Inc.</u>, 483 N.W.2d 701, 710 (Minn. 1992).

The record confirms that petitioner had a nonfrivolous claim
of age discrimination under the Minnesota Human Rights Act, which
he asserted in good faith.  By reason of his age, petitioner was
a member of a protected class under the Minnesota Human Rights
Act when Okabena terminated his employment.  See Minn. Stat. Ann.
sec. 363.01, subd. 3.  Petitioner was qualified for his position;
indeed, petitioner was employed at Okabena for 16 years and
received at least two promotions during that period.  Petitioner
was terminated from Okabena and replaced with a younger worker.[11]
Petitioner also testified that during the negotiations he
specifically mentioned a potential claim for age discrimination
and pointed to a specific pattern of discrimination against
Okabena employees.

We find, therefore, that petitioner also had asserted a bona
fide claim of age discrimination at the time the settlement
agreement was executed.

---

[11]At the time he was terminated, petitioner was
approximately 49 years old.  Mr. Dayton testified that petitioner
was replaced by a younger person.

II.  Were the Payments Received on Account of Personal Injuries
     or Sickness?

The second prong of the Schleier test requires a taxpayer to show that the payments were received on account of personal injuries or sickness.  See sec. 104(a)(2); Commissioner v. Schleier, 515 U.S. at 337.  In order to satisfy Schleier, a causal connection must be established between the tort, the personal injury resulting, and the amount received in settlement. See O'Gilvie v. United States, 519 U.S. 79, 82-83 (1996); Commissioner v. Schleier, supra at 329-331.  Each element of the tort settlement must be examined to determine whether there is a direct causal link between that element and the personal injury or sickness.  See Commissioner v. Schleier, supra at 330.

     A.   Severance Payments

Petitioners assert that they erroneously included the severance payments in their gross income and that, as a result, they have overpaid their Federal income taxes for 1993 and 1994 and are entitled to a refund.  We disagree.

Generally, severance pay, like the pay it replaces, is includable in income.  See sec. 61(a)(1); Lubart v. Commissioner, 154 F.3d 539 (5th Cir. 1998), affg. T.C. Memo. 1997-343; Keel v. Commissioner, T.C. Memo. 1997-278; sec. 1.61-2(a)(1), Income Tax Regs.  Where, as here, the settlement agreement lacks express language stating that the payment was (or was not) made on account of personal injury, the most important factor in

determining whether the payments are excluded from income is the intent of the payor.  See Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Bagley v. Commissioner, 105 T.C. at 406; Bent v. Commissioner, 87 T.C. at 244; Laber v. Commissioner, T.C. Memo. 1997-559.

Petitioner has not presented any credible evidence to prove that Okabena's intent was other than to provide him with severance pay under the settlement agreement.  To the contrary, the evidence establishes that Okabena intended the payments to be exactly what they purported to be--severance payments.  The severance payments were made over a period of 18 months in amounts equal to petitioner's salary before he was terminated. Okabena continued to process and withhold Federal taxes on the severance payments as it did with other employees' salaries.  The fact that the severance payments were treated as "wages" and taxes were withheld provides compelling evidence that the payments were not intended to be compensation for personal injuries.  See Mayberry v. United States, 151 F.3d at 860-861.

Petitioners contend that, under Roemer v. Commissioner, 716 F.2d 693 (9th Cir. 1983), revg. 79 T.C. 398 (1982), and Threlkeld v. Commissioner, 87 T.C. 1294 (1986), when payments are based on amounts of income lost due to tortious conduct, the amounts received by the tort plaintiff or prospective tort plaintiff are exempt from taxation pursuant to section 104(a)(2).

In this case, we are not presented with the problem of determining the correct tax treatment of a lump-sum payment, which may or may not have encompassed lost income, as the courts faced in <u>Roemer</u> and <u>Threlkeld</u>. Here, the parties to the settlement agreement carefully drafted the settlement agreement so as to separate the severance payments from other types of payments, including lump-sum payments that, in fact, were made to compensate petitioner for his alleged personal injuries. Under the circumstances of this case, the failure of the settlement agreement to provide that the severance payments were intended to compensate petitioner for personal injuries is compelling evidence that the severance payments were not made for that purpose. The settlement agreement contains a specific provision acknowledging that the lump-sum payments made to petitioner were intended "solely as compensation for claimed damages on account of personal injuries arising from the occurrence within the meaning of Section 104(a)(2)". No such provision was included with respect to the severance payments. The settlement agreement also indicated that the severance payments were subject to withholding taxes.

On this record, we can find no causal link between the severance payments and petitioner's alleged tort claims. There is no evidence that the severance payments were made in settlement of petitioner's alleged claims for defamation and age

discrimination or that the severance payments were made on account of personal injury or sickness.  See sec. 104(a)(2); Commissioner v. Schleier, 515 U.S. at 337; Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir. 1961) (despite taxpayer's belief that company paid him to avoid litigation, payments were in nature of severance payments and were not excludable from income under section 104(a)(2)), affg. T.C. Memo. 1960-21.

We conclude that the severance payments were not made to petitioner "on account of personal injuries", and no personal injury affected the amount of the severance payments received. Sec. 104(a)(2); Commissioner v. Schleier, supra at 330.  The severance payments properly were included in petitioners' 1993 and 1994 gross income, and petitioners properly paid Federal income taxes on the severance payments.  Petitioners are not entitled to their claimed refund.

B.  Lump-Sum Payments

Paragraph 7 of the settlement agreement specifically stated that the lump-sum payments were "intended solely as compensation for claimed damages on account of alleged personal injuries arising from an occurrence within the meaning of Section 104(a)(2)".  Where, as here, there is an express allocation contained in the agreement between the parties, it generally will be respected if the settlement agreement was negotiated by parties with adversarial interest, at arm's length, and in good

faith.  See Bagley v. Commissioner, 105 T.C. at 406; Robinson v. Commissioner, 102 T.C. 116, 133-134 (1994), affd. on this issue 70 F.3d 34 (5th Cir. 1995); Burditt v. Commissioner, T.C. Memo. 1999-117.  However, an express allocation is not necessarily determinative if other facts indicate that the payment was intended by the parties to be for a different purpose.  See Bagley v. Commissioner, supra at 406.

We are satisfied that Okabena intended the lump-sum payments to compensate petitioner for his personal injury claims.  Okabena recognized that petitioner had bona fide claims for defamation and age discrimination at the time of the settlement agreement and agreed to make the lump-sum payments "on account of" petitioner's personal injuries.  When Mr. Dayton was asked at trial whether petitioner's personal injuries were of concern to Okabena at the time the settlement was made, Mr. Dayton responded:  "To a certain degree.  Yes."  When Mr. Dayton was asked, "And why was that concern to the company?", he responded: "Well, I think we were concerned about Ron's well-being, at that point.  He has – was a long-time employee of Okabena.  But the overriding factor was that we were just trying to agree – to reach an agreeable settlement between both parties."  Before finalizing the settlement agreement, Okabena evaluated petitioner's defamation and discrimination claims and certainly was aware of petitioner's allegations that his reputation and his

professional career had been damaged severely by Okabena's actions.

We find that Okabena made the lump-sum payments "in lieu of" petitioner's prosecution of his tort claims. Id.; see also sec. 1.104-1(c), Income Tax Regs. We hold, therefore, that the lump-sum payments are excludable from petitioner's income under section 104(a)(2).

C. Liquidation Payment

Paragraph 5(a) of the settlement agreement clearly and expressly states the purpose for making the liquidation payment to petitioner: "[Okabena] will pay Gross $516,907.33 * * * as the value of his interests in the partnerships and other investments, except Okabena Partnership V-8 and Energy Corporation E-2". The carefully structured settlement agreement does not designate the liquidation payment as compensation for alleged personal injuries.

The liquidation payment was not made to petitioner "on account of personal injury or sickness"; rather, petitioner received the liquidation payment because he terminated his employment with Okabena and liquidated his interests in Okabena investment entities. The liquidation of petitioner's interests in the investment entities was prompted by the desire of petitioner and Okabena to sever most of petitioner's ties with

Okabena.[12]  The liquidation payment was not in lieu of litigation
of petitioner's alleged defamation or age discrimination claim.
We conclude, therefore, that petitioner is not entitled to
exclude the liquidation payment from his income under section
104(a)(2) because the liquidation payment was not received "on
account of personal injuries or sickness."  Commissioner v.
Schleier, 515 U.S. at 330.  The payment received by petitioner
comprised the proceeds from the sale of capital assets and must
be included in income as such in the year it was received.

III.  Conclusion

     We have carefully considered all remaining arguments made by
the parties for contrary holdings and, to the extent not
discussed, conclude they are irrelevant or without merit.

     To reflect the foregoing,

                                   Decision will be entered

                                   under Rule 155.

_____

     [12]Petitioner retained his interests in two of the Okabena
investment entities under certain supplemental agreements that
were modified as part of the settlement.